## STEWART v. LANSING.

1. The indorsee of negotiable paper which has a fraudulent or illegal inception must, in order to recover thereon, prove that he is a *bona fide* holder thereof for value.

2. Coupon bonds of a town in New York were by commissioners executed to a railroad company pursuant to an order of a county judge, which was annulled and reversed by the judgment of the Supreme Court in a proceeding whereof, before they were issued, the commissioners and the company had due notice. *Held*, 1. That, as between the company and the town, the bonds are invalid. 2. That, in an action on coupons detached therefrom, the plaintiff must, to make out his right to recover against the town, establish his *bona fide* ownership of them. 3. That upon the question of such ownership a judgment in his favor upon other coupons detached from the same bonds does not estop the town.

3. Upon the evidence in this case it was not error to charge the jury to find for the town.

ERROR to the Circuit Court of the United States for the Northern District of New York.

The facts are stated in the opinion of the court.

*Mr. James R. Cox* for the plaintiff.

*Mr. Francis Kernan* for the defendant.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

This was a suit by John J. Stewart to recover the interest due on coupons which matured July 1, 1872, Jan. 1, 1873, Jan. 1, 1874, July 1, 1874, Jan. 1, 1875, July 1, 1875, Jan. 1, 1876, and July 1, 1876. They were attached to seventy-five bonds of $1,000 each, purporting to have been issued by the town of Lansing, under the authority of a statute of New York, passed May 18, 1869, to permit municipal corporations to aid in the construction of railroads. The defence, stated generally, was that the bonds had been issued without authority of law. At the trial, after the testimony on both sides was in, the court instructed the jury to find a verdict for the town, which was done, and judgment entered accordingly. This ruling furnishes the principal ground of error assigned here.

The testimony is all set out in the bill of exceptions. The undisputed facts are that the county judge of Tompkins

County, within which the town is situated, assuming to act under the authority of that statute, rendered, March 21, 1871, a judgment appointing commissioners to execute bonds of the town to the amount of $75,000, and invest them in the capital stock of the Cayuga Lake Railroad Company. On the 27th of the same month, at the instance of the opposing taxpayers of the town, a writ of *certiorari*, directed to the county judge, was issued from the Supreme Court of the State for a review of this judgment. This writ was, at or about its date, served on the judge, who, on the 1st of September, made his return thereto, sending up, as required by law, a transcript of the record of the proceedings before him which were brought under review. Of this writ, and what was done thereunder, both the commissioners appointed by the judge and the railroad company had full notice; but the commissioners, on or about the 14th of October, 1871, executed the bonds which had been authorized, payable to bearer on the first day of January, 1902, with coupons for semi-annual instalments of interest attached, and delivered them to the company in exchange for seven hundred and fifty shares of its capital stock. At the same time the commissioners took from the company a bond of indemnity to save them harmless from all costs, liabilities, or expenses on account of what had been done.

The bonds, as soon as delivered, were taken by the company to New York, and there pledged as collateral security for money borrowed. On the 27th of May, 1872, the Supreme Court in general term reversed and in all things held for naught the judgment of the county judge appointing commissioners and authorizing the issue of the bonds. This judgment of the Supreme Court still remains in force.

On the 26th of November, 1872, the company arranged with Elliott, Collins, & Co., a banking firm in Philadelphia, for the money to take up the bonds in New York, and they again pledged the bonds to that firm as security for the advances made. On the 8th of February, 1873, this debt to Elliott, Collins, & Co. was paid, and they parted with the bonds. The entire testimony as to what took place at this time is as follows: —

William Elliott, the senior member of the firm, examined as

a witness, said: "We did not sell the bonds at all. The bonds, on the 8th of February, 1873, we parted with. The cash we received on parting with them was $54,337.50. I have never seen any of the bonds since. The loan negotiated by us was paid in this way. Up to this time the loan had not been paid: It was paid by this money."

On cross-examination, he said: "I cannot tell through whom personally we received the bonds. Think we received them by express. They were negotiated by Mr. Delafield, either personally or by letter. All our transactions with that company have been done through Mr. Delafield. . . . I am not acquainted with John J. Stewart, the plaintiff in this action. I do not know where he lives, or in what State he lives. Neither myself or my banking firm ever had any transactions with him to my knowledge." This testimony was taken on behalf of the plaintiff, by deposition, on the 18th of July, 1876.

Afterwards, on the 18th of August in the same year, another deposition of the same witness was taken in behalf of the plaintiff. In this deposition, looking at Exhibit D, which was as follows:

"PHILADELPHIA, Feb'y 8, 1873.

"Cayuga Lake R. R. Co.

| | |
|---|---|
| 75,000 Town of Lansing bonds | $54,337 50 |
| Notes March 29, $50,000; 49 days' interest, $408.33 | 49,591 67 |
| Credit Cayuga Lake | $4,745 83 " |

he said: "This is a statement of the sale of said town of Lansing bonds by the firm of Elliott, Collins, & Co. The sale was made at the time it bears date, Feb. 8, 1873; it was made out and sent to the Cayuga Lake R. R. Co. at that date. I said in my previous examination that we did not sell the bonds in question. I intended by that to say that we did not make the negotiation for the sale of them, but they passed through our hands, on terms which were agreed on by others. The price at which they were sold we were consulted about, and our advice asked. We received the money and delivered the bonds on that day."

On cross-examination, he said: "I do not wish to change, but merely explain my testimony given at the previous examination. Exhibit D is in the handwriting of my son, who gener-

ally makes out the accounts, Adolphus William Elliott.   He is still living in this city.   To my present recollection, the first time I saw Exhibit D is to-day.   I have no recollection of ever having seen it before.   The statement first credits the Cayuga Lake R. R. Co. with $54,337.50, under date of Feb. 8, 1873, that being the avails of the bonds. . . . It was sent to the Cayuga Lake R. R. Co. at the time, as I have stated before. I have no personal knowledge of Mr. Stewart ; I mean the Mr. Stewart who is plaintiff in this action.   I have no personal knowledge of any business transaction whatever between myself or my house and Mr. Stewart.   I have no personal knowledge whether these bonds ever passed into the hands of Mr. Stewart, the plaintiff in this action, nor whether he ever paid anything for them.   Somebody paid for them and we got the money."

Talmadge Delafield, the treasurer of the company, a witness called on the part of the plaintiff, testified that Elliott, Collins, & Co. held the bonds after the transfer to them until Feb. 8, 1873, when they rendered an account of the sale.   On cross-examination he said, "I have no personal knowledge of the sale of the bonds.   Never saw Mr. Stewart; don't know that there is such a man.   I have never corresponded with him, nor he with me.   Whatever occurred between them and him was entirely without my knowledge."

On the 30th of May, 1874, a suit was brought in the name of Stewart, the present plaintiff in error, in the Circuit Court of the United States for the Northern District of New York, to recover the coupons due July 1, 1873, averring his ownership thereof.

On the 20th of July, 1872, Manassah Bailey brought suit in the same court to recover the coupons of July 1, 1872.   In each of the suits the defences were that the bonds and coupons were issued without the authority of law, and that the plaintiffs respectively were not _bona fide_ holders.   The suits were tried together, and upon the same evidence, so far as applicable. In both cases it was decided that the bonds were invalid, and in that of Bailey judgment was given for the defendant, because it had not been satisfactorily shown that he was a _bona fide_ holder.   In the Stewart case, however, the court used this language in its opinion: "The suit of Stewart differs from the

one by Bailey, in that it appears that the bonds were pledged as collateral in February, 1873, to Elliott, Collins, & Co., of Philadelphia, and sold by them after consultation with the officers of the railroad company. Elliott, Collins, & Co. were holders for value before maturity, and their sale to satisfy the pledge conveyed their title to the purchaser. Whether the plaintiff was the purchaser from them directly or not is not clear, but, however this may be, he succeeds to all the rights of Elliott, Collins, & Co., and occupies the position of a *bona fide* purchaser. As against a *bona fide* holder of the coupons, none of the defences interposed are tenable." Acting on this principle, the court gave judgment in favor of Stewart for the coupons he held.

Upon the trial of the present action, the record of the first Stewart judgment was given in evidence, and the counsel for the plaintiff, who had also been counsel for Stewart and Bailey in the former suits, was examined as a witness. He testified that after the judgment against Bailey, he gave the coupons sued for in that action to a Mr. Tryon, in New York. He was unable to say from whom he got them back, nor when. Neither did he tell from whom he got the bonds and coupons which were used in evidence at the present trial.

As between the railroad company and the town, the judgment of the Supreme Court reversing and annulling the order of the county judge invalidated the bonds. If the bonds had not been delivered before, they could not have been afterwards. The judgment of reversal was equivalent between these parties to a refusal by the county judge to make the original order.

The next inquiry is whether, on the evidence, Stewart occupied in this suit a better position than the town. That depends on whether the testimony was such as to make it the duty of the court to submit to the jury, under proper instructions, the determination of the question whether he was in a commercial sense the *bona fide* holder of the coupons sued for.

It is an elementary rule that if fraud or illegality in the inception of negotiable paper is shown, an indorsee, before he can recover, must prove that he is a holder for value. The

mere possession of the paper, under such circumstances, is not enough. *Smith* v. *Sac County*, 11 Wall. 139.

Here the actual illegality of the paper was established. It was incumbent, therefore, on the plaintiff to show that he occupied the position of a *bona fide* holder before he could recover. This, it is contended, was conclusively established by the judgment in the suit on the coupons of July, 1873. The issue in that case was as to the ownership of those coupons, and did not necessarily involve an ownership of the bonds. We have often held that coupons detached from bonds are negotiable instruments, and capable of separate ownership and transfer. *Clark* v. *Iowa City*, 20 Wall. 583. While the court in its opinion, when rendering the former judgment, used language broad enough to cover the bonds, this language must be confined in its effect to the issues on trial, that is to say, the ownership of the coupons alone. In *Cromwell* v. *County of Sac* (94 U. S. 351), it was distinctly held that a determination in one action, that a plaintiff was not an owner for value of certain coupons sued on, did not estop him from proving in another action that he was such an owner of other coupons detached from the same bonds. The proposition in this case is but the converse of that.

This makes it necessary to inquire whether upon the testimony the burden of establishing a *bona fide* ownership was so far overcome at the trial as to make it improper for the court to take that question from the jury. The testimony is noticeable rather for what is omitted than for what was introduced. It would seem to have been easy to prove the exact facts as to the "parting with" the bonds by Elliott, Collins, & Co. Although the bonds had been pledged in New York before, Elliott, Collins, & Co. took them from the company, not from the New York holders. The company negotiated the loan from them, and on taking up the bonds in New York made a new pledge. This was all done after the judgment of the Supreme Court upon the *certiorari*. In the former suit a judgment had been secured only by proving a *bona fide* ownership in the plaintiff. Notice of the necessity of establishing the same fact in this case was, therefore, given the plaintiff and his counsel. Acting on this notice, the same counsel who

appeared in the former case went to Philadelphia to get the necessary testimony. He called on the senior member of the firm of Elliott, Collins, & Co. and took his deposition. In this deposition it was clearly shown that although that firm had "parted with" the bonds, and got some money when they did so, which was put to the credit of the company, they did not sell the bonds. That was done, if done at all, by some one else. Not satisfied with this testimony, the same counsel went again to Philadelphia to make another effort. He took with him a paper he had found in the handwriting of the junior member of the firm, now known as Exhibit D. Instead of examining the junior partner, he went again to the senior partner, who evidently knew but little personally about the transaction, and stopped with him, although it appears that the witness who made out the exhibit was then in the city, and it was again stated that the sale was not negotiated by the firm, but that the bonds only passed through their hands under terms which had been agreed on by others. Who those others were is not stated. Neither the actual purchaser nor his representative in the negotiation was named. Stewart, the plaintiff, was not known to any of the witnesses examined. No one had ever seen him. His counsel, though examined as a witness, gave no information in respect to him, and was also unable to tell from whom the Bailey coupons were received. It is by no means certain from the testimony whether such a man as the plaintiff is actually in existence. Even the witness Elliott was not asked whether he knew of the decision of the Supreme Court when his firm took the bonds. The sale, if actually made, was at an enormous discount. Although the Bailey coupons are included in this suit, another action for their recovery was pending at the time Elliott, Collins, & Co. parted with the bonds, in which the same defences now relied on were set up. The counsel now appearing for the present plaintiff was also the counsel for Bailey in that action, and for the railroad company when the bonds were got from the commissioners. It would have been apparently so easy to make the necessary proof, if it could have safely been done, that we are unable to account for its absence, except on the theory that a disclosure of the whole truth would be fatal to a

recovery. While it would not, perhaps, have been improper for the court, in the exercise of its rightful discretion, to leave the case to the jury on the evidence, we cannot say it was error not to do so. In *Pleasants* v. *Fant* (22 Wall. 116), it was held that "if the court is satisfied that, conceding all the inferences which the jury could justifiably draw from the testimony, the evidence was not sufficient to warrant" a particular verdict, the jury might be so instructed. *Railroad Company* v. *Fraloff*, 100 U. S. 24; *Oscanyon* v. *Arms Company,* 103 id. 261. This case, in our opinion, comes under that rule.

The record in the Bailey suit was certainly admissible in evidence upon the issue as to the *bona fide* ownership of the coupons of July, 1872.

Without, therefore, considering any of the other questions presented for our consideration, on the argument, the judgment is

*Affirmed.*