## TOWN OF LANSING v. LYTLE.

(*Circuit Court, N. D. New York.* March 18, 1889.)

1. RAILROAD COMPANIES—MUNICIPAL AID—BONDS—ACTION TO COMPEL CANCELLATION.

A county judge, assuming to act under act N. Y. May 18, 1869, permitting municipal corporations to aid in the construction of railroads, rendered a judgment appointing commissioners to execute bonds of a town. The bonds were accordingly executed and delivered to the railroad company, but before delivery a writ of *certiorari* issued from the supreme court to review

the judgment, which was afterwards reversed. In an action against a transferee of the bonds to compel their surrender for cancellation, *held*, that defendant had the burden of showing that he, or some ·one under whom he claimed, was a *bona fide* holder for value.

**2.** SAME—BONA FIDE HOLDER—EVIDENCE.

A Texas banker, from whom defendant obtained the bonds, testified that he was informed by a resident of New York that the bonds, which were of the par value of $75,000, could be bought for $50,000, and that he bought them of a stranger to him, residing in New Orleans, for $50,000, without making any inquiry as to their history or value, acting upon the assumption that the purchase was a good one because suggested by such informant; that he got with them $10,000 in overdue coupons, but that that circumstance made no impression on him; that he paid for the bonds with a check signed by him as president of his bank, which check was produced from the drawee bank, at New Orleans, and was not shown to have been paid by the Texas bank; that he left the bonds at the place of purchase for several months, when he took them to New York, where he interviewed his informant, because he did not know whether he made the purchase for himself or for such informant, and afterwards sued on the coupons. *Held*, that his testimony did not show him to be a *bona fide* purchaser for value.

**3.** SAME.

Defendant testified that the banker, who was a confidential friend and financial supporter, offered to buy a third interest in his ranch, worth $150,000, and pay him $75,000 worth of bonds, stating that the bonds were good; that defendant accepted the offer at once, making no inquiry as to the bonds, and 15 days later signed a receipt for the bonds, which were not delivered, but were placed to his credit, or held subject to his order, and which were not seen by him until two days afterwards. He sent the coupons for collection to the same attorneys whom the banker had employed. The testimony of the banker was substantially the same. The receipt described the bonds as county bonds, and stated that they were taken in part payment for a third interest in ranch and stock. No conveyance was executed, but several months afterwards defendant and his co-owner and the banker formed a corporation, to which the ranch was conveyed. The capital stock was $500,000, divided into 1,000 shares, of which the banker received 290. The 290 shares were the equivalent of the banker's interest in the assets of the firm composed of defendant and his co-owner. *Held*, that defendant was not shown to be a *bona fide* holder for value.

In Equity.

*H. V. Howland*, for plaintiff.

*Sherman & Sterling*, for defendant.

WALLACE, J. This action is brought to compel the defendant to surrender up 75 $1,000 municipal bonds, with annexed interest coupons, together with certain past-due coupons for $18,375 unpaid interest for cancellation, and to restrain the defendant from bringing suits at law upon them, and from transferring them. The defendant has filed a cross-bill, praying for a decree against the town of Lansing for the amount of the past-due coupons, with ·interest from the date of their maturity. The bonds purport to have been issued by the town of Lansing under the authority of the statute of the state of New York passed May 18, 1869, to permit municipal corporations to aid in the construction of railroads. The county judge of Tompkins county, in which county the town is situated, assuming to act under the authority of that statute, rendered a judgment March 21, 1871, appointing commissioners to execute bonds of the town to the amount of $75,000, and invest them in the capital stock of the Cayuga Lake Railroad Company. October

.14, 1871, the commissioners executed the bonds in suit, and delivered them to the railway company in exchange for capital stock. The bonds are payable to bearer on the 1st day of January, 1902, with interest at the rate of 7 per cent., payable semi-annually upon the presentation of the coupons annexed. Before the commissioners delivered the bonds to the railway company a writ of *certiorari* was issued from the supreme court of the state, directed to the county judge, for a review of this judgment, and such proceedings were thereafter duly had pursuant to such writ that in May, 1872, the supreme court of the state reversed and in all things set aside the judgment of the county judge appointing the commissioners, and authorizing the creation of the bonds. At the time the commissioners issued and delivered the bonds to the railway company they, and the railway company also, had full notice of the issuing of the writ of *certiorari;* and the commissioners took from the company a bond of indemnity to save themselves harmless from all liability in consequence of their acts. The bonds, as soon as delivered, were pledged by the company with bankers in New York as collateral security for a loan of $50,000, and in November, 1872, these bankers transferred them to Elliott, Collins & Co., bankers of Philadelphia, pursuant to an arrangement between the latter and the railway company by which they paid up the loan of the company to the New York bankers, and took the bonds for security, and for sale as agents of the railway company. In February, 1873, Elliott, Collins & Co., sold the bonds for the railway company for $54,337, acting under the instructions of the company; and the proceeds were applied to pay the loan of the company, and the balance was placed to its credit, and drawn out by it from time to time. It does not appear who purchased the bonds of Elliott, Collins & Co., but it does appear that at a later period one Stewart claimed to be the owner of them, and brought a suit upon some of the coupons against the town. That suit was tried in this court in June, 1877, and a verdict was rendered for the town, and a judgment entered dismissing the suit upon the merits. Subsequently the bonds were in the possession of Stewart at the city of New Orleans, and in 1881 he transferred them to one Brackenridge, together with, coupons representing $10,000 or $12,000 of unpaid interest. Brackenridge claims to have paid Stewart $50,000 for the bonds and coupons. He brought two suits upon the coupons in this court—one founded on 900 coupons, which matured from July 1, 1876, to January 1, 1882, inclusively; and the other founded on 300 coupons, which matured from July 1, 1882, to January 1, 1884, inclusively. There is no evidence in the record of the result of these suits brought by Brackenridge, but it may be inferred from the circumstances attending the subsequent sale of the bonds by him to Lytle that those suits were prosecuted unsuccessfully, or were abandoned. Lytle, the present defendant, bought the bonds of Brackenridge at San Antonio, Tex., in the spring of 1884, and claims to have taken them in exchange for a one-third interest in a cattle ranch on the Frio river, in which he owned a half interest jointly with one McDaniels.

The controversy turns upon the question whether Lytle or any one

of the previous holders of the bonds and coupons acquired the title of a *bona fide* purchaser to them. It was held by the supreme court in the suit of Stewart against the town that as between the railroad company and the town the bonds were invalid; and that the judgment of the supreme court of the state reversing the judgment or order of the county judge authorizing the commissioners to execute the bonds was equivalent to a refusal by the county judge to make the original order. *Stewart* v. *Lansing*, 104 U. S. 505. It was also held in that case that the actual illegality of the bonds was established by the judgment of reversal, and it was therefore incumbent upon the person claiming title to them to show that he occupied the position of a *bona fide* holder before he could prevail against the town. Conformably with the rule applied in that case, the burden of proof is therefore upon the present defendant, and it is only necessary to consider whether the evidence in his behalf meets the requirements of the rule, and shows satisfactorily that he is, or that Stewart or Brackenridge was, a *bona fide* holder of the bonds and coupons. Elliott, Collins & Co. did not sell the bonds to satisfy their claim as pledgees, but sold them as agents for the railway company; consequently it is unnecessary to consider whether the defendant can rely upon their title as *bona fide* holders under the pledge. That title never passed to the purchaser, and the purchaser only succeeded to the rights of the railway company; and the railway company, by paying the loan, did not acquire the rights of the pledgees, but merely reinvested itself with its original rights in the bonds. If Stewart or Brackenridge was a *bona fide* holder of the bonds and coupons, it is immaterial whether, when the defendant took them, he did or did not acquire them *mala fides*, because he can stand upon the title of his predecessor, and such title inures to him. *Commissioners* v. *Bolles*, 94 U. S. 104; *Montclair* v. *Ramsdell*, 107 U. S. 147, 2 Sup. Ct. Rep. 391. The purchaser of negotiable paper with knowledge of its infirmities as between the original parties can recover its full amount, and is not limited to a recovery of what he may have paid or advanced for the paper before acquiring notice if he has purchased of one who bought it before maturity, for value, and without notice of any infirmity or defense. *Butterfield* v. *Town of Ontario*, 32 Fed. Rep. 891. It is not necessary for one who seeks to avail himself of the title of a prior holder of negotiable paper to show affirmatively that the previous holder took the paper without notice of the facts affecting its validity; but, when illegality in the inception of the paper is shown, the burden is cast upon him to prove that the previous holder parted with value when he acquired the paper. *Smith* v. *Sac Co.*, 11 Wall. 139.

The first inquiry is whether Stewart was a *bona fide* holder of the bonds and coupons. Upon this issue the facts of the case differ but slightly from those which were considered by the supreme court in the suit of Stewart against the town, and which were held to be insufficient to invest him with such a title. It is now shown that there was such a person in existence, that he had the bonds in his possession, that he transferred them to Brackenridge, and that he received a check of $50,000

for them, made by Brackenridge. But there is no evidence to show from whom or how he acquired the bonds, or whether he paid anything for them, or parted with anything of value when he took them; and from all that appears he may have held them, and been the agent to sell them for some one else. Stewart's title is of no avail to the defendant, because there is a total absence of evidence that Stewart was a purchaser of the bonds for value.

The next inquiry is whether Brackenridge was a *bona fide* holder of the bonds and coupons. The record contains the history of his purchase as detailed by himself, and he is the only witness who testifies upon the subject. His credibility as a witness is overthrown by the inherent improbability of the transaction as he describes it. He was a banker at San Antonio, Texas, and he states that at the time of the purchase he was informed by one Stillman, who resided in New York, that the bonds could be bought for $50,000. He says he bought them of Mr. Stewart, who lived in New Orleans, and who until that time was a stranger to him, paying him $50,000 for them. He professes to be unable to give the conversation that took place between Stewart and himself, or the substance of it, further than that he told Stewart that he understood that Stewart had $75,000 of Lansing bonds which he could get for $50,000, and Stewart assented. He states that he made no inquiry of Stewart otherwise in reference to the bonds; that he made no inquiry of Stillman or any one else in regard to their history or value; and that he acted wholly upon the assumption that the purchase would be a good one because Stillman had suggested it. At the time he bought the bonds he got with them $10,000 or $12,000 in overdue coupons; and he states that this circumstance made no impression upon him; that he bought the bonds and coupons in the lump; and he conveys the impression that he did not know until subsequently anything about the coupons. He testifies that he left the bonds at the place where he bought them for several months, and when he took them away he carried them to New York city and went to see Stillman, and that he went to see Stillman because he did not know whether he had bought the bonds for himself or for Stillman, and to find out whether Stillman wanted to take the bonds off his hands, or whether he was to keep them himself. It appears that, immediately after this interview with Stillman, Brackenridge placed the coupons in the hands of attorneys at New York city, who brought the two suits upon them which have been referred to. He testifies that he paid for the bonds by his check. A check is produced made by him as president of the San Antonio National Bank on the Louisiana National Bank of New Orleans, bearing the indorsement of Stewart "For deposit;" and the vice-president of the Louisiana National Bank testifies that it was paid by the Louisiana National Bank. It is singular that this check is produced by the bank upon which it was drawn, and that no attempt has been made to show that it was paid by the San Antonio Bank, or to give by Brackenridge, or any one else, any light upon its history. Brackenridge does not testify explicitly that he paid the check, but says "it was paid." It is so utterly improbable

that a man of the intelligence and experience of Brackenridge would put $50,000 into a purchase of bonds of a town in a distant state without any inquiry as to their history or value, or that he should make such a purchase without knowing whether he was buying for himself or some one else, or that he would enter into and close such a transaction so summarily and carelessly as to take no notice of the fact that he was getting $10,000 or $12,000 of coupons for nothing, that his testimony would be rejected as incredible and untrue if its value were to be tested by this part of his narrative alone.    But he further discredits himself by the transparent falsity of his testimony respecting the exchange of the bonds with the defendant Lytle.    He attempts to represent that he made a veritable trade with the defendant, by which he acquired the interest in the ranch property for the bonds, and parted with them absolutely to the defendant.    The examination of this transaction necessarily involves the inquiry whether Lytle was a *bona fide* purchaser of the bonds, and the conclusion reached will dispose of the remaining issue in the controversy.

Whether there was a *bona fide* sale or exchange of the bonds between Brackenridge and Lytle, by which as the latter asserts he became a *bona fide* holder of the securities, is a question upon which the testimony of Lytle himself is extremely valuable.    The defendant testifies that he is a stock raiser, and in May, 1884, had a half interest in the ranch property, one McDaniels owning the other half; that he had been intimately acquainted with Brackenridge for several years; that they had been confidential friends, and Brackenridge had been his financial backer.    According to his testimony the ranch property, exclusive of the stock upon it, was worth $150,000 or $160,000.    The following questions and answers embrace his entire testimony on his direct examination relative to the exchange:

"*Question.* State whether or not in the spring of 1884 you had any negotiation with him in regard to the purchase of the bonds mentioned in the complaint, and, if so, what was it?    *Answer.* I bought these bonds from him some time in the spring of 1884.    *Q.* State the transaction between you and him; what he said about the bonds, and what was said about the price, and what you paid for them.    *A.* Merely that he would buy a third interest in my Frio property, and pay me in bonds. I would take the bonds in payment. He would pay me $75,000 worth of bonds. He said the bonds were good. Knowing Mr. Brackenridge as I did, and the business transactions I had with him at different times, I never made any inquiry about the bonds."

Upon his cross-examination the following questions and answers appear:

"*Question.* When was the first you knew anything about his having these seventy-five town of Lansing bonds,—that you knew anything about his having anything to do with them?    *Answer.* When the bonds were delivered to me.    *Q.* Had there never been anything said to you about them before? *A.* Not about these particular bonds.    *Q.* Where were you when he told you about having these bonds?    *A.* At his house.    *Q.* And then he told you what? what did he tell you about the bonds?    *A.* He said he had so many bonds— he said he had $75,000 of bonds that he would give me for a third interest in my ranch,—in the Frio ranch. He said the bonds were good. I told him all right, I would sell him the third interest. He said, 'All right; consider it a

trade.' Q. What else was said? A. That was all that was said. Q. Did he produce the bonds? A. No, sir; not then. Q. You had never seen them? A. I had not seen them. Q. You have told all he said about them? A. Yes, sir. Q. How long was that before you consummated the bargain? A. The trade was consummated then. Q. There was no writing? A. No, sir."

The defendant further testified that about 15 days later he signed a paper acknowledging the receipt from Brackenridge of $75,000 in bonds in payment for a one-third interest in the Frio ranch, and the bonds were then transferred to him at the bank of which Brackenridge was president. The bonds were not delivered, but Brackenridge directed the cashier to place the bonds to the credit of Lytle, or hold them subject to Lytle's order; and it was not until two or three days subsequently that the defendant first saw the bonds, at which time Brackenridge was present, and advised the defendant to send the coupons to New York for collection. The coupons were sent by him for collection to the same attorneys in New York city whom Brackenridge had previously employed. According to the testimony of Brackenridge, in the spring of 1884 he wanted to acquire an interest in the ranch, and made the defendant an offer to purchase an interest. The following questions and answers comprise the substance of his testimony about the negotiation:

"Question. What took place between you on the subject? Answer. I told him it would be better for me to take an interest in the ranch,—a one-third interest. Q. What offer did you make him to pay for that interest? A. I offered to give him these Lansing bonds. I told him I did not want to pay cash for it, but 'I will give the Lansing bonds.' I told him there were $75,000 in bonds; that I considered them good and worth as much as his property. Q. What did he say to that? A. He finally accepted the proposition; said, 'All right, we will do it.' I think the final settlement of that was made at my house."

Brackenridge's testimony in respect to the transaction is substantially a reiteration of the narrative of Lytle, and these two are the only witnesses who testify in regard to it. The testimony of both is to the effect that Brackenridge made a proposition to Lytle to give him the bonds for the interest in the ranch, told him they were good, and the trade was promptly closed without any further bargaining, and without any inquiry on the part of Lytle about the value of the bonds, or why Brackenridge was willing to give $75,000 of bonds for an equivalent of $50,000. The receipt which Lytle gave to Brackenridge bears date May 24, 1884, describes the bonds as "County Bonds," and recites that the bonds are taken as "part payment" for a one-third interest in the Frio ranch and the stock. No conveyance of the property was ever executed by Lytle or Lytle and McDaniels to Brackenridge; but, in the later part of the following January, Lytle, McDaniels, and Brackenridge joined in articles of association as incorporators of the San Antonio Ranch Company, and the ranch was conveyed to the corporation. The certificate of incorporation recites that the capital stock of the company is to be $500,000, divided into 1,000 shares of $500 each. Subsequently scrip for 290 shares of the stock of this company, "full-paid and non-assessable," were issued to Brackenridge. This scrip is all that Brackenridge has to produce for the

ranch interest for which he claims to have exchanged the bonds. So far as the truth can be ascertained from the rambling, incoherent, and contradictory statements of Brackenridge and Lytle upon cross-examination, it would seem that these 290 shares represent nothing more than the one-third interest which Brackenridge had in the firm assets of Lytle & Co. before the date of the pretended exchange of the bonds. It appears that Brackenridge had been a partner of Lytle and McDaniels, under the firm name of Lytle & Co., for a year or two prior to the time of the alleged exchange; had put in $60,000 or $66,000; and that the assets of the firm represented an investment of $180,000. The Frio ranch was needed for the purposes of the business of the concern, and had been bought by Lytle and McDaniels before Brackenridge became a partner. At the time the San Antonio Ranch Company was organized, all the assets of Lytle & Co. consisted of cattle and this Frio ranch, and for the purposes of capitalization the cattle were estimated at $300,000, and the ranch at $200,000, thus making up the nominal capital stock of $500,000. It appears that $60,000 face value of the stock of the corporation has never been issued. Consequently what was issued to Brackenridge comprised one-third of the issued capital stock, and is the equivalent of his interest in the assets of Lytle & Co., if the three were equal partners. That they were equal partners appears from the testimony of Lytle that he was entitled to one-third of the capital stock for his interest. Lytle states also that the $60,000 unissued stock represents property of Lytle and McDaniels in which Brackenridge had no interest. It would seem, therefore, that Brackenridge never received anything for the bonds except stock to the amount of his one-third interest in the firm of Lytle & Co. before the pretended purchase of the Frio property. No attempt has been made by the counsel for the defendant to elicit from either Brackenridge or Lytle an intelligible explicit statement to explain how Brackenridge has received anything for the bonds. This significant omission strengthens the inference which the testimony fairly suggests, that he never did get anything. The narrative of the alleged exchange of the bonds between Brackenridge and Lytle, as testified to by them, is as full of improbabilities as is the story of Brackenridge in reference to his purchase of the bonds of Stewart. It is incredible that Lytle would have given property which he asserts he considered worth $50,000 for bonds of which he knew nothing at all; without any inquiry about their history or value. It is incredible that he would have made such a bargain without the slightest deliberation, and immediately when and upon the terms proposed by Brackenridge. It is incredible that a sane man would entertain the proposition to take such bonds when offered at an enormous discount without asking why they were depreciated, or why the seller wished to dispose of them; or that he would consider the matter at all without inquiring whether the interest had been paid in the past. But Lytle did not know, if his story is true, whether they were town bonds or county bonds, or in what state the municipality was located which had created them. Before any transfer of the title of the ranch property was made, Lytle had found out that the town would not pay the coupons, and pre-

sumably had learned the history of the previous litigations from his attorneys.. Nevertheless he would have it appear that he never complained of being misled or overreached by Brackenridge, and allowed the transaction to be consummated, and Brackenridge to obtain the fruits of it as though he had not been deceived.    The testimony suggests very persuasively that the pretended exchange was a mere sham, entered into in order to get the bonds in the hands of an ostensible *bona fide* purchaser. It is doubtful whether there was any real delivery of them to Lytle, and whether his sending the coupons to the attorneys whom Brackenridge had previously employed was anything more than a mere matter of form. The conclusion is reached without the slightest hesitation that Lytle was not a *bona fide* purchaser of the bonds.

It was remarked by the supreme court in the case of Stewart against the town that "the testimony (introduced to establish the *bona fide* ownership of the plaintiff) is noticeable rather for what is omitted than for what was introduced."    That remark is equally applicable to the present case.    The suit involves a very considerable sum of money, and the previous litigations have apprised the counsel for the defendant of the necessity of making clear proof that Stewart, or some earlier purchaser from Elliott, Collins & Co., or Brackenridge, or the defendant, became a *bona fide* holder of the bonds.    Nevertheless the case of the defendant has been permitted to rest upon the flimsiest evidence, apparently without any effort to trace the history of the bonds until they came into the hands of Brackenridge, and without any attempt to fortify or explain the improbable narrative of Brackenridge and Lytle.    The omission to call McDaniels as a witness, or explain why he was not called, is suggestive. Everything developed in the record is quite consistent with the theory that Stillman, or some person whom he represents, has the same interest now in the bonds which he had at the time that he first approached Brackenridge, and that neither Stewart, nor Brackenridge, nor Lytle ever really owned them.    It may be that Brackenridge really purchased the bonds of Stewart, but, if he did, the circumstances of the purchase are so pregnant with suspicion as to justify the belief that if he was really ignorant of their history it was because he was intentionally so. · The rule which shields a purchaser of commercial paper who has not bought *mala fides*, though he may have known facts and circumstances that should have caused him to suspect that it was subject to a defense in the hands of the seller, or by ordinary diligence could have ascertained the facts, does not protect a purchaser who willfully avoids making inquiry when circumstances of grave suspicion point to a fraud.    *Hamilton* v. *Vought*, 34 N. J. Law, 187.    As is said by the court in *Murray* v. *Lardner*, 2 Wall. 121, "guilty knowledge and willful ignorance alike involve the result of bad faith."    When the suspicious circumstances are of a substantial character, and speak unmistakably to a man of common intelligence, the purchaser cannot safely assume to have been blind and deaf.

·A decree is ordered directing the defendant to surrender up the bonds and coupons for cancellation, and dismissing his cross-bill.