PERE MARQUETTE R. CO. v. BRADFORD et al.

(Circuit Court, W. D. Michigan. April 4, 1906.)

No. 1589.

1. CANCELLATION OF INSTRUMENTS—ADEQUATE REMEDY AT LAW—DEFENSE TO ACTION ON INSTRUMENT—NEGOTIABLE BONDS.

Where negotiable bonds of a corporation were procured to be issued by fraud, the corporation may maintain a suit in equity against holders who are chargeable with notice of the fraud for their cancellation and to enjoin their transfer, notwithstanding the fact that as against the defendants the fraud might be pleaded as a defense at law.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 8, Cancellation of Instruments, § 13.]

2. INJUNCTION—GROUNDS FOR DISSOLUTION OF PRELIMINARY INJUNCTION—NEW MATTER IN ANSWER.

A preliminary injunction will not be dissolved upon an answer admitting the material equities of the bill and setting up new matter in avoidance.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Injunction, § 381.]

3. SAME.

The rule that a preliminary injunction, granted ex parte, will be dissolved on the coming in of an answer denying the equities of the bill, is not of universal application; but the matter rests largely in the discretion of the court.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Injunction, § 381.]

4. SAME—PRELIMINARY INJUNCTION—PREVENTION OF IRREPARABLE INJURY.

Complainant railroad company filed its bill for the rescission of a contract for the purchase of the stock of another company and the cancellation of its negotiable bonds, to the amount of $3,500,000, issued in payment for such stock and held by defendants. The bill alleged that the contract was made with, and the bonds issued to, one of the defendants, through fraudulent collusion between him and a group of officers and directors of complainant who then controlled its action, and who acted in the transaction in their own private interest and contrary to the interests of complainant, and facts were alleged which, if proved, sustained such allegations. It was also alleged that the other defendants had knowledge of the fraud. The answer, to which oath was waived by the bill, denied the fraud and set up other matters in avoidance. A temporary restraining order was issued ex parte, and on a motion for preliminary injunction to restrain defendants from transferring the bonds and from further prosecuting actions at law on coupons therefrom the proofs were conflicting. Held, that such injunction should be granted, in view of the irreparable loss which complainant would sustain by a transfer of the bonds to innocent holders, should it sustain the allegations of its bill on final hearing.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Injunction, §§ 305, 306, 95.]

In Equity. On motion for preliminary injunction.

Otto Kirchner (Lawrence Maxwell, Jr., and Francis Lynde Stetson, of counsel), for complainant.

Taggart, Denison & Wilson (Lawrence Godkin, H. D. Peck, and John F. Dillon, of counsel), for defendants Bradford and Kleybolte.

Harmon, Colston, Goldsmith & Hoadly, for receiver.

LURTON, Circuit Judge. The complainant, a railroad corporation of the state of Michigan, filed this bill to obtain the rescission of a contract under which the corporation purchased the entire capital stock of the Chicago, Cincinnati & Louisville Railroad Company, a railroad corporation of the states of Ohio and Indiana, from the defendant Wm. A. Bradford, Jr., and to cancel an issue of collateral trust bonds, aggregating $3,500,000, issued to said Bradford in payment for said stock. It is averred that 1,115 of these bonds are now held by the defendants Kleybolte and the remainder by the defendant Bradford. Another object of the bill is to enjoin the trial of two suits on the law side of this court, upon matured coupons from bonds held by the defendants Kleybolte, wherein said defendants are plaintiffs and this complainant a defendant.

Two grounds of relief are relied upon: First, that the contract under which the purchase of said shares was made and the bonds of the corporation were issued was procured by fraudulent collusion between the defendant Bradford and a group of the officers and directors of the railroad company then dominating its corporate action; second, that the Pere Marquette Railroad Company, as a corporation of the state of Michigan, neither owning nor operating any railroad in the state of Indiana or Ohio, had no power, under either its charter or the law of Michigan or any other state, to acquire the capital stock of the Chicago, Cincinnati & Louisville Railroad Company, and that the contract under which its said bonds were issued was, therefore, ultra vires.

Upon a former day a restraining order was issued upon an ex parte application, to stand until notice could be given of an application for a temporary injunction. In pursuance of this order an application for such injunction has now been made upon the bill, answer, and ex parte affidavits filed by each side. That the bill upon its face makes a prima facie case for an injunction is plain. Indeed, one cannot read its averments without concluding, if the facts charged are true, that the case furnishes an example of the most pernicious methods of what has come popularly to be known as modern "high finance." In substance the bill charges that the action of the corporation in buying the capital stock of the Chicago, Cincinnati & Louisville Railroad Company and issuing its bonds in payment for same was dictated by a dominating group of the company's officers and directors, styled in the bill "promoters," in their own selfish and personal interest, and as a means of carrying out a scheme for their own benefit.

If the averments of the bill be true, that group of directors owned 110,000 of the shares of the Pere Marquette Company, a block sufficient to control for all practical purposes the action of the corporation.

These "promoters" conceived a scheme for selling this controlling block of Pere Marquette stock to the Cincinnati, Hamilton & Dayton Railroad Company, a corporation of the state of Ohio, at a large profit to themselves. But, according to the charges of the bill, this result was not to be effected by an open negotiation with a board of directors free to act for the best interest of the C., H. & D. Co., as an entity, but by obtaining a controlling interest in the stock of the C., H. & D. and thereby reorganizing its board of directors in the interest of this deal. Now the charge of the bill is that these "promoters" undertook to organize a "syndicate," who should subscribe a fund great enough to obtain the necessary amount of Cincinnati, Hamilton & Dayton stock to carry out their plan, and that to obtain the necessary assistance various inducements were offered to secure the co-operation of others. The defendant Bradford was induced to join the syndicate and to subscribe thereto the sum of $625,000. It is in substance averred that these directors of the complainant corporation, for the purpose of securing the co-operation of said Bradford in their plan of selling their stock to the Cincinnati, Hamilton & Dayton Company agreed that his subscription to the syndicate pool, organized to obtain control of the directory of the Cincinnati, Hamilton & Dayton Company, should be conditioned upon a sale by him of his stock in the Cincinnati, Chicago & Louisville Company to the Pere Marquette Company on or before the falling due of any payment by him of the first installment of his subscription at a price satisfactory to him. In support of this averment an agreement in writing between F. H. Prince & Co. and Newman Erb, alleged to have been acting for the said directors composing the "promoters," and George Fernauld & Co., representing said Bradford, is filed as an exhibit. That agreement is in these words:

"In consideration of George A. Fernauld & Company subscribing for 5,000 shares of common stock of the C., H. & D. Railroad Company under the subscribers' agreement of May 19, 1904, with George W. Young and others as syndicate managers, and for other valuable consideration, moving from said George A. Fernauld & Company to us, the receipt of which is hereby acknowledged by us, we hereby agree that in case the negotiations now pending for the Pere Marquette Railroad Company acquiring the capital stock of the Chicago, Cincinnati & Louisville Railroad Company, and issuing temporary bonds in payment therefor, not being consummated and carried out on terms satisfactory to William A. Bradford, Jr., on or before the time when the first installment upon said subscriptions shall become due and payable (not later than June 30th, 1904), we, the undersigned, Newman Erb and F. H. Prince & Co., jointly and severally, agree to and will assume and take off the hands of said George A. Fernauld & Co. said subscriptions for 5,000 shares of common stock, and pay all liabilities connected therewith, including the installments called, or to be called, and to protect said Fernald & Co. against all liability connected therewith; said subscription to be thereupon assigned by said George A. Fernald & Company to us.

"[Signed]                                            F. H. Prince & Co.
                                                         "Newman Erb."

That this arrangement gave these directors of the Pere Marquette Company a personal interest in carrying out this plan of causing a sale of Bradford's stock to their corporation, which was antagonistic to their relation as trustees of that corporation, is clear. Another part of

the proposed deal with Bradford was that when the object of the syndicate should be accomplished the bonds of the Pere Marquette Company, issued to him for his stock, should be indorsed by the Cincinnati, Hamilton & Dayton Company. It is then averred that the plans of the "promoters" went through. The syndicate succeeded in obtaining enough shares to secure control of the Cincinnati, Hamilton & Dayton Company. The directors of that company, or nearly all of them, were induced to resign. The nominees of the syndicate succeeded them, and this reorganized board carried out the purpose for which they had come into being by putting through the various deals prepared beforehand, including the purchase of the Pere Marquette shares owned by the "promoters" who had obtained Bradford's co-operation. The averment of the bill is that the Kleyboltes were partners, and as such members of this Cincinnati, Hamilton & Dayton syndicate; that one of them, Rudolph Kleybolte, was put into the Cincinnati, Hamilton & Dayton board, and as director voted to confirm and carry out all of the prearranged plans, including the purchase of the Pere Marquette stock owned by the "promoters" and the guaranty of the Pere Marquette bonds issued to Bradford for his stock; and that in fact he was in complicity with the plans of the syndicate and aware of the character of the deal made with Bradford when he obtained the Pere Marquette bonds now held by his firm. It is averred that the railroad controlled by the stock so purchased from Bradford is of no value to the Pere Marquette system; that it will require a vast sum of money to complete it at the two unfinished ends. It is bonded to the amount of $6,000,000, and it is averred that it has never been able to earn its operating expenses, and that the stock imposed upon the Pere Marquette Company at a cost of $3,500,000 has no value, except such as is purely speculative. It is charged that the "promoters" in the board of the complainant knew, or would have known if they had exercised their faculties, that this was not a purchase which was to the advantage of their company. It is also averred that by the sale of their stock the promoters lost their control of the complainant corporation, and that it has been lately set free by the election of a new board of directors, which represents the corporation itself and stands for all of its stockholders and creditors, and that the new board, upon becoming aware of the fraudulent imposition of said contract upon their corporation, repudiated the agreement and directed a return of said stock and the institution of this suit to rescind the agreement and obtain the cancellation of the bonds issued under its provisions.

If the averments of the bill shall be established, no other conclusion can be drawn than that the purchase of the Chicago, Cincinnati & Louisville stock was the result of a fraudulent plot carried through by the dominating influence of directors of that company, acting for themselves and not for the corporation, whose representatives they nominally were. Waiving for the purposes of the present motion the question of ultra vires in the acquisition of stock in a railroad wholly outside of the state of Michigan by a Michigan railroad corporation, there can be no doubt that, if the complainant shall

ultimately make out the truth of the facts charged, the cancellation of the bonds issued in pursuance of the deal must follow.

Aside from the defense of ultra vires, which I do not now consider, the bonds in question are negotiable securities, against which the defense of fraud in their inception would be unavailing if they shall come to the hands of an innocent holder for value. The mere fact that the defense of fraud can be made at law is no answer when a complainant is so circumstanced as that his defenses will be cut off if the bonds shall come to the hands of an innocent purchaser. If they are now, as is charged, in the hands of holders who are not entitled to enforce payment if the facts charged in the bill are true, equity will interpose and enjoin their assignment until the question can be tried out, and then compel their cancellation, and thus avoid the danger of their being put to some vexatious or injurious use if suffered to remain outstanding. In the case of Louisville, etc., Ry. Co. v. Ohio Valley Improvement Co. (C. C.) 57 Fed. 42, I had occasion on circuit to pass upon the question of equitable relief against negotiable bonds in the hands of persons affected with notice of defense, and that case upon that question was subsequently approved by the Supreme Court in Louisville, N. A. & C. R. Co. v. Louisville Banking Co., 174 U. S. 552, 567, 19 Sup. Ct. 817, 43 L. Ed. 1081. It follows that upon the face of the bill the complainant has made a case upon the fraudulent character of the bonds sought to be canceled which entitles them to a temporary injunction, and it was upon the showing so made, and upon the consideration stated, that I made an ex parte restraining order, to hold until notice could be given and formal application made for an injunction pendente lite.

The defendants have answered, and have denied any knowledge of any bad faith in their issuance or connivance in the breach of any duty by complainant's directors. The oath to the answers was waived, and their answers, though sworn to, are entitled only to the evidential weight of an ex. parte affidavit upon this motion. Affidavits and counter affidavits have also been filed, tending to support or controvert the averments of the bill. Certain so-called "special defenses" are presented by the answers of Bradford, involving the question of whether the complainant is entitled to rescission by reason of alleged changes in the condition of the property of the Chicago, Cincinnati & Louisville Company since it passed under complainant's control as sole stockholder, and a question of alleged subsequent ratification by the stockholders of the complainant company.

The question as to whether, under all the circumstances of the case, the complainant company is in a situation to demand the equity of rescission by reason of an alleged inability to restore the Chicago, Cincinnati & Louisville Railroad to Mr. Bradford as sole stockholder, or by reason of estoppel by reason of the effective subsequent ratification of the contract with Bradford by its stockholders, are manifestly defenses in avoidance of the case made by the bill. I am not sure that new issues thus presented should be of controlling influence, if the court is otherwise persuaded that upon the equities of the bill the injunction should stand. That an injunction will not be dissolved

upon an answer admitting the material equities of the bill and setting up new matter in avoidance is well settled. Beach, Modern Eq. § 782; Speak v. Ransom, 2 Tenn. Ch. 210; Hoffman v. Hummer, 17 N. J. Eq. 263, 267. This practice is peculiarly applicable here, in view of the character of the new matter set up by the answers. Both involve questions requiring a wide range of evidence, as well as complicated questions of law, and are manifestly questions which should be postponed to a final hearing, when the evidence shall be fully before the court. This is also true of the defense made by the Kleyboltes of innocent purchasers. That is a defense in avoidance, and, if the plaintiffs show that the bonds were issued in fraud of the corporation, it will devolve upon them to make out this defense. Louisville, etc., Ry. Co. v. Ohio Valley Co. (C. C.) 57 Fed. 42; Stewart v. Lansing, 104 U. S. 505, 26 L. Ed. 866.

Aside from the question of ultra vires arising out of the Michigan act of February 27, 1889 (section 3405a, How. Ann. St. Supp.), the result in this suit must ultimately turn upon the question as to whether complainant's board of directors acted in good faith when they contracted to buy Bradford's stock in the Chicago, Cincinnati & Louisville Railroad Company and when they issued the company's collateral trust bonds in payment for same. A mere mistake of judgment will not suffice to convict them of bad faith. The question will be whether, in dealing with him, they were honestly acting for the corporation, or agreed to buy his stock as a means of benefiting themselves at the expense of their corporation. Of course, if it shall appear that the bargain they made was palpably detrimental to the corporation they represented, then action so opposed to the true interests of the corporation itself would lead to an inference that they were not actuated by an honest desire to subserve such interest. If, in addition, it appear that they had a private end to subserve, the inference that they acted in their own interest and for their own ends will be much supported. I am not sure that the showing made by the exhibits and ex parte affidavits make it clear that the complainant will succeed upon a final hearing. But upon a question of the allowance or disallowance of an injunction pendente lite it is not essential that there shall appear anything more than that there is ground for supposing that relief may be given. Beach, Modern Equity, § 785; Huffman v. Hummer, 17 N. J. Eq. 263; Hudson v. Butrom, 3 Madd. 448; Atwood v. Barham, 2 Russ. 186. The case as presented here is more analogous to a motion for the dissolution of an injunction upon the coming in of an answer than it is to an original application for an injunction, by reason of the fact that upon the strength of the averments of the bill a restraining order has been already allowed.

The sufficiency of the complainant's case, as exhibited by his bill, to justify an injunction, cannot be denied. The question, then, is whether the pending injunction, which has preserved the status quo until to-day, shall be discharged because the defendants have filed an answer denying the fraud alleged. The rule that an injunction granted ex parte will be dissolved upon the coming in of an answer denying the equities of the bill is not of universal application. The continuance of a re-

straining order or the dissolution of an injunction granted upon notice must, in the very nature of the matter, rest largely in the discretion of the court. Blount v. Societe, etc., Pasteur, 53 Fed. 98, 3 C. C. A. 455, 457; Duplex Printing Co. v. Campbell Printing Press Co., 69 Fed. 250, 16 C. C. A. 220. In Blount v. Societe, etc., Pasteur, cited above, our own Circuit Court of Appeals approved the rule as stated in Glascott v. Lang, 3 Mylne & C. 455, where it was said:

> "In looking through the pleadings and evidence for the purpose of an injunction, it is not necessary that the court should find a case which would entitle the plaintiffs to relief at all events. It is quite sufficient if the court finds, upon the pleadings and upon the evidence, a case which makes the transaction a proper subject of investigation in a court of equity."

In the same case Judge Jackson cited and approved the ruling of Lord Cottenham in Shrewsbury v. Railway Co., 1 Sim. (N. S.) 410, 426, when he said:

> "That there are two points in which the court must satisfy itself: First, it must satisfy itself, not that the plaintiff has certainly a right, but that he has a fair question to raise as to the existence of such a right. The other is whether 'interim' interference, on a balance of convenience or inconvenience to the one party and to the other, is or is not expedient."

The fundamental purpose of a special injunction restraining the assignment of negotiable instruments, such as the railroad bonds here in question, is to preserve the statu quo until the hearing. The plain and undeniable fact is that the defense of fraud in the inception of these bonds will be cut off if they shall pass into the hands of an innocent purchaser. To discharge the restraining order, which has operated to prevent an assignment until this hearing, upon the denial of the answer supported by ex parte affidavits from some of the parties implicated in the transaction sought to be undone, will be to deny all relief against the bonds, if upon a final hearing complainant shall make out its case, if the defendants in the meantime shall have disposed of them to innocent purchasers. Under such circumstances it is the plain duty of the court to preserve the situation until the transaction depicted by the bill may be thoroughly investigated. High on Injunctions, § 1512; Beach, Modern Eq. Pr. §§ 785, 786; Poor v. Carleton, 3 Sumn. 70, Fed. Cas. No. 11,272. The injury to complainant by a dissolution, followed by a bona fide sale of the bonds, would be impossible, and a practical denial now of the relief it is plainly entitled to if the facts be as alleged. Hoagland v. Titus, 14 N. J. Eq. 81; City of Newton v. Levis, 79 Fed. 715, 718, 25 C. C. A. 161. If the case be one which turns upon a question of fraud, put in issue by the answer, the chancellor should be slow to dissolve or deny an injunction upon the denials of the answer and ex parte affidavits, especially when the fraud alleged largely depends upon inferences to be drawn from either established facts or facts about which there is an apparent conflict in the affidavits. High on Injunctions, §§ 1508, 1509; Beach, Eq. Pr. §§ 782, 785, 786, 787; Huffman v. Hummer, 17 N. J. Eq. 263.

I am not insensible of the consequences to the defendants if an injunction be allowed to stand. They, at most, however, will be restrained from selling and compelled to hold onto their investment,

when they might wish, or their circumstances demand, that they shall be sold. This is, at most, a minor injury, compared to that which will result to complainant if defendants are allowed to sell their bonds and complainant shall make out its case at a final hearing. This injury may be mitigated by a speedy preparation of the case for trial, and if the complainant is to hold onto its injunction it should speed the case. I will make all reasonable orders to this effect upon application and notice.

Neither do I think, under all the circumstances of this case, that the defendants should be suffered to prosecute their suits at law. Those suits are upon coupons cut from the bonds in the hands of the defendants Kleybolte and Bradford. The questions of fact and law in those suits are identical with those here. The determination of this suit upon its merits will determine the obligation of the complainant upon the coupons there involved. The convenience of all parties will be subserved, and time and expense saved, by the trial of these questions in this case. If so advised, the defendants may file cross-bills asking decrees upon their interest claims, if it shall turn out that the bonds from which their coupons come are valid obligations of the complainant. If they do not take this course, there will be no great delay if, when this case is decided, the decree is promptly set up in the actions at law as a bar to a relitigation of the same defenses. There is no hard and fast rule for the determination of cases coming under the general doctrine of avoidance of a multiplicity of lawsuits. Each case must in large measure stand upon its facts. Hale v. Allison, 188 U. S. 77, 23 Sup. Ct. 244, 47 L. Ed. 380; Wyman v. Bowman, 127 Fed. 258, 263, 62 C. C. A. 189.

The circumstances of this case are peculiar. To allow these suits to go on in the same court between the same parties, involving the same questions, where the hearing must include a large volume of evidence, partly oral and partly documentary, makes a case of great inconvenience and justifies the continuance of the restraining order heretofore made; and it is so ordered.