In re HOPPER–MORGAN CO.

(District Court, N. D. New York. January 15, 1908.)

No. 2,271.

1. BILLS AND NOTES—BONA FIDE PURCHASERS—PURCHASE FROM AGENT.

Where claimant purchased certain notes of his agent, who was a note broker, claimant was charged with any knowledge as to the invalidity of the notes that his agent possessed.

2. SAME—TRANSFER—BONA FIDE PURCHASER—BURDEN OF PROOF.

Where claimant purchased certain notes from his agent, a note broker, and claimed that such agent took the notes in good faith and for value, the burden was on claimant to establish such fact and to make a full disclosure.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 7, Bills and Notes, §§ 1675. 1676.]

3. SAME—EVIDENCE.

Evidence *held* to warrant a finding that claimant was not a bona fide purchaser of certain notes on which a claim was based, but was charged with knowledge of his agent, a note broker, that the notes were fraudulently issued and had been fraudulently diverted, and were therefore not proper claims against the maker.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 7, Bills and Notes, §§ 1832–1839.]

In Bankruptcy. Appeal from order of referee in bankruptcy disallowing the claim of John B. Pilling of $6,252.63 on three promissory notes alleged to have been made by the bankrupt.

Kellogg & Reeves, for claimant.

Brown, Carlisle & McCartin, for trustee.

RAY, District Judge. About April 4, 1905, one Roger Morgan, treasurer of the Hopper-Morgan Company, a manufacturing corporation of New York state having its factory and place of business at Watertown, N. Y., now bankrupt, without authority or consideration to the company, issued some $50,000 of the paper of the company in notes for various amounts, made out on the note blanks of said company, payable to the order of "ourselves," and indorsed, "Hopper-Morgan Co., Roger Morgan, Treas." The indorsement was without authority. One of the notes in question here for $1,250 was also indorsed by Roger Morgan individually. These notes, aggregating $50,-000, were delivered to one Trautwine, under the agreement they should be used as collateral only, taken up and returned before maturity, and not become a charge against the company. They had no legal inception, although Trautwine agreed to pay Morgan a certain percentage for their use. The notes were at once fraudulently diverted by Trautwine. These facts are not in dispute.

Prior to this time Morgan, as treasurer, had issued another batch of notes, dated March 29th, aggregating about the same amount, without authority or consideration, indorsed in the same way, all payable to the order of "ourselves." These were also delivered to Trautwine by Morgan under a similar agreement, and were also fraudulently diverted by him. All the notes of both issues were made payable at 395 Broadway, New York City. As all of the notes of the first issue have either been gathered up and returned without payment, or have turned up in the hands of innocent holders for value, and have been proved against the estate, that issue becomes immaterial, except as it bears on the question of general knowledge among note brokers in Boston, Mass., of the invalidity of this class of notes, and knowledge on the part of this claimant and of the person from whom he obtained them. Hence it will be understood I am speaking hereafter of the second issue of notes above described, of which the notes here in question are a part; the note for $1,250 being one of the originals, or one of a smaller batch issued about the same time, but of the same character as the $5,000 note, and the two of $2,500 having been made and delivered by Morgan in place of a note of $5,000 of that issue before it became due.

Trautwine delivered the notes to one Morton, a note broker of Boston, Mass., who was a party to the fraud evidently. There is no evidence he was ever a holder in good faith or for value. The notes in question here were delivered by Morton to one Robinson, another note broker, who in turn delivered them to one Collins, another note broker, who in turn delivered them to one Hasseltine, another note broker, who was agent for the claimant here, John B. Pilling, and is therefore charged with any knowledge Hasseltine had. Hasseltine kept no record of his transactions, or of these transactions with reference to the notes in question. The claimant insists that Hasseltine took the notes in good faith and for value. The burden was on him to show—prove —this fact, and to make full disclosure. Stewart v. Lansing, 104 U. S. 505, 26 L. Ed. 866; King v. Doane, 139 U. S. 166, 173, 11 Sup. Ct. 465, 35 L. Ed. 84; Lytle v. Lansing, 147 U. S. 59, 62, 13 Sup. Ct. 254, 37 L. Ed. 78; Pana v. Bowler, 107 U. S. 542, 2 Sup. Ct. 704, 27 L. Ed. 424. Failure to make full disclosure may fatally weaken proof. Stewart v. Lansing, 104 U. S. 510 (26 L. Ed. 866). So evidence on the subject is to be carefully scanned. Lytle v. Lansing, 147 U. S. 68, 13 Sup. Ct. 258, 37 L. Ed. 78. "If the amount paid is greatly disproportionate to the real value, the security may be regarded as having been obtained without paying anything for it." King v. Doane, 139 U. S. 174, 11 Sup. Ct. 468, 35 L. Ed. 84.

Hasseltine testifies, in substance: That he had sold notes to Pilling, father of claimant, in his lifetime, and since then had sold notes to Pilling. That he met Collins, who told him he had the $5,000 note and $1,250 note which he wished Hasseltine to take. That he paid Collins for the $5,000 note as follows: Was allowed $100 discount, gave him a note of $1,000 made by one Helm, indorsed by G. I. Robinson, another note broker, with collateral; gave up to Collins his individual note of $2,500, secured by collateral, $140,000 of the common stock of the Lenox Hotel, of Boston, Mass.; also returned to Collins $350

of his checks, and placed a $25,000 insurance policy on the life of Collins as a broker. Premium was $1,390.25, which Hasseltine paid in this way: $1,050 was deducted from the $5,000 note; that is, $1,050 was deducted from the $1,390 premium he was to pay. Says he cannot tell when he took the notes, but thinks it was in May, 1905; that he cannot tell when he paid the insurance premium; could pay it when he got ready and that the insurance was dated February 25th. Also that he paid for the $1,250 note as follows: Discount allowed $31.25; balance of the insurance premium $340.25; and returned to Collins of his (Collins') checks, which he (Hasseltine) held, $878.50. Says Collins told him he owned both notes. Cannot tell whether the notes he gave Collins were past due or not. Cannot tell how or when he paid the premium on the insurance. Now holds the policy as security for something. Got it January, 1906, in another deal. It belongs to the John Pilling estate. He got the Helm note from Robinson. He cannot tell when he got it, or what he paid for it, and cannot tell what the consideration for Collins' $2,500 note was. Checks might have been for cash; might have been discounts. Did not have possession of any of these things—"stuff" he called it—when he made the trade with Collins, except the checks. It all belonged to Pilling, etc. It seems checks were given on balances and held, with understanding they were not to be presented until some fixed time, as other deals might be made and a balance found the other way, in which they were taken as if a payment were made in cash. The Helm note was made by another note broker, who had a batch of some $50,000 of these notes, and who had dealings in regard to some of them with these other parties, or some of them. In short, the checks were a sort of I. O. U., if they ever existed. Pilling was sworn, and says he cannot tell when he got the notes, except it was prior to September 1st, and cannot tell what he gave for them; keeps no books, but purchases about $100,000 of notes per year; is mixed up with Collins in the note business to quite an extent; did not know at the time of this deal between Collins and Hasseltine; cannot even tell what Hasseltine gave Collins.

There is no evidence that this so-called collateral, or the checks and notes, were of any value. A clerk of Collins says he was dealing in notes of no value, makers of no responsibility, and this was done intentionally. There is evidence showing or tending to show that Pilling, Hasseltine, and the other brokers knew, at the time of this deal, that these Hopper-Morgan notes were in ill odor, worthless, and for some reason being hawked about Boston and transferred for about 10 cents on the dollar, but not on account of the financial standing of Hopper-Morgan Company. Inquiry would have disclosed all the facts regarding these notes. True, Morgan wrote two or three letters to other parties regarding certain notes, stating those were good and would be met. But those letters did not refer to these notes, and there is no evidence Hasseltine knew of them, or relied on the statements therein contained. I have given a general outline of the testimony only. There is no doubt in my mind that Hasseltine, who had had some of these notes before, knew the true character of these notes. I have no doubt it was a mere trade in "cats and dogs," paper "cats and dogs," and understood so to be. There was neither "good

faith" nor "value" in the commercial sense. Of course, property of value is the same as cash. It matters not what the standing of Pilling is, or was, except as bearing on his credibility. If a man intrusts his note deals to a trader in notes, who acts as his agent with general authority, he is charged with the knowledge of his agent gained and in mind in so doing the business.

Bona fide purchasers and holders of commercial paper, fair on its face and not dishonored, are always to be protected; but in this case the fraud of those who obtained and diverted the notes in question is imputed to subsequent holders and cast on this claimant the burden of showing he was a bona fide holder for value, or that he took from some one who was. This he has wholly failed to do. A decided badge of bad faith is that the $5,000 note, before due, was voluntarily returned to Morgan by claimant or his agent, and the two notes, of $2,500 each, now presented, obtained from him in its place; such notes being payable at a later day. This was done, evidently, to enable them to put the smaller notes off on some innocent person. The storm they saw impending broke too soon. It is not credible that this claimant surrendered up and obtained two smaller notes payable at a later day in exchange for the $5,000 note, seeking the change himself, if he was a holder in good faith and for value. At the time of such exchange it was common knowledge that these notes were fraudulently issued and had been fraudulently diverted. The testimony of Collins and Hasseltine is self-contradictory, is full of inherent improbabilities and inconsistencies, and as a whole is not entitled to credence. The referee did not give it full faith and credit, and certainly I cannot.

Whether the "stuff" which Hasseltine says he gave Collins for the notes was of any value is a question of fact, and I find it was not. It is strange that, if Hasseltine was purchasing the notes for Pilling, he should have paid part in "cats and dogs" belonging to Pilling, not in his possession, and part in checks of Collins, not presented, not produced here, and in an insurance deal, with which Pilling had nothing to do and in which he had no interest. Their story of the transaction is so inconsistent with honesty and fair dealing, and so improbable, except among those seeking to hide the true nature and purpose of their deals, that I find the claimant is not a holder of these notes in good faith and for value, and has failed to show that he was. Another badge of fraud is found on one of the $2,500 notes, taken after claimant says he became the owner of the $5,000 note and made the exchange. That is indorsed by some one, and the indorsement erased, inked over. This is not explained. In fact, both Pilling and his agent, Hasseltine, profess ignorance. That they are ignorant on the subject is beyond belief. When a witness willfully testifies falsely in one material regard, or conceals facts willfully in giving his testimony, the court may disregard all he says. The testimony of both Pilling and Hasseltine is remarkable for what they do not disclose regarding facts they must have known. This fact is of weight. Stewart v. Lansing, 104 U. S. 506, 26 L. Ed. 866.

The referee was right in rejecting this claim, and his order disallowing same is approved and confirmed.