### EDWARDS v. BATES COUNTY.

(Circuit Court, W. D. Missouri, W. D. July 12, 1902.)

1. MUNICIPAL BONDS—INNOCENT HOLDER—BURDEN OF PROOF.

To entitle a holder of municipal bonds who purchased after maturity to protection as an innocent purchaser for value, where it is shown that the bonds were issued illegally or without consideration, he must prove that he acquired title through a prior holder, who took them before maturity for value and without notice of their invalidity.

2. SAME—REQUISITES AND VALIDITY—CONDITIONS PRECEDENT TO ISSUANCE.

Under a statute authorizing a county court to call an election in a township to vote on the issuance of railroad bonds on a petition of 25 "taxpayers and residents" of the township, and to issue bonds on behalf of the township in case of a two-thirds vote in favor thereof, an affirmative finding by the court that the petitioners were taxpayers and residents of the township is a condition precedent essential to confer jurisdiction upon the court to take further action; and the failure to make such a finding is not cured by a mere recital in an order made at a subsequent term that the action then taken was in pursuance of the petition of taxpayers and residents of the township theretofore filed.

3. SAME.

Under a statute which made the certificate of the county clerk the only evidence of the result of an election in a township to vote on a proposition to subscribe for stock in a railroad company and to issue bonds in payment therefor, and where the county court was authorized to make the subscription and issue the bonds in case of a favorable vote, the clerk's certificate was a jurisdictional fact; and a recital in the record of the court of the filing of a certificate showing the result of an election by "the qualified voters of the county" is insufficient to support a finding by the court that two-thirds of the voters of the township voted in favor of the subscription.

¶ 1. Bona fide purchasers of municipal bonds, see note to Pickens Tp. v. Post, 41 C. C. A. 6.

**4. SAME—MISSOURI STATUTE.**

Laws Mo. 1868, p. 92, authorized townships to subscribe to the stock of a railroad company, and provided that, in case of the performance of the required conditions precedent, "it shall be the duty of the county court to make such subscription in behalf of such township, according to the terms and conditions thereof, and if such conditions provide for the issue of bonds in payment of such subscription, the court shall issue such bonds in the name of the county * * * and the same shall be delivered to the railroad company." Held, that under such statute the power of the county court, as agent of the township, was limited to the issuance and delivery of the bonds to the railroad company, and that bonds issued thereunder and sold at a discount by a commissioner appointed by the court, who was also paid a commission out of the proceeds, were invalid.

**5. SAME—ACTION—BURDEN OF PROOF.**

The burden rests upon a plaintiff in an action on municipal bonds, where a part of the issue were sold without authority, of which fact he was chargeable with notice, to show that those sued on were not affected by such invalidity.

**6. SAME—DEFENSES—CONDITIONS PRECEDENT TO DELIVERY.**

Where a statute authorizing townships to subscribe for the stock of railroad companies requires the proposition voted on to state the terms and conditions on which the subscription shall be made, a condition requiring the company to construct its road through the township, and to establish a station at a town therein, before receiving the bonds to be issued in payment for the stock, must have been complied with to render the bonds valid and binding in the hands of one not entitled to protection as an innocent purchaser.

**7. RAILROADS—MUNICIPAL SUBSCRIPTION TO STOCK—REVOCATION OF AUTHORITY.**

Authority delegated by vote of a township to subscribe in its behalf for stock of a certain railroad company is revoked by operation of law where the company ceases to exist, by reason of its consolidation with another company, before the subscription has actually been made.

**8. EVIDENCE—RECORDS—SELF-SERVING ENTRIES.**

An entry in the minute book of a railroad company, purporting to be a copy of a certified copy of the record of a county court, is not evidence against a third party of the contents of such record.

**9. RAILROADS—MUNICIPAL SUBSCRIPTION TO STOCK—EVIDENCE OF AGENT'S AUTHORITY.**

Where a proposition adopted by the voters of a township to subscribe to the stock of a railroad company provided that the county court should appoint a commissioner, who should be a citizen of the county, to make the subscription and to dispose of the bonds to be issued in payment for the stock, it is essential that the authority of a person who is claimed to have made the subscription should be shown by the records of the court.

**10. FEDERAL COURTS—COLLUSION TO INVOKE JURISDICTION.**

Evidence considered, and held to show that plaintiff, in an action in a federal court on municipal bonds, was not the owner of such bonds, but that the same were owned when the action was commenced by a citizen of the state, and that the bringing of the action in plaintiff's name was a fraud on the jurisdiction of the court.

Action at Law on Municipal Bonds.

Thomas K. Skinker, for plaintiff.
Wallace & Wallace, for defendant.

PHILIPS, District Judge. If it were conceded that the plaintiff, Edwards, at the institution of this suit, was in fact the owner of the bonds in question, yet, as he did not acquire them until after their

maturity, he took them subject to all the equities and defenses which the county could make against the railroad company. The taker of overdue paper "takes it as a holder with notice that it is subject to some defenses, if he takes it at a time when in due course it should have been paid. He is, therefore, subject to the defense (1) that it was affected in its inception with some inherent vice, as, for instance, fraud, illegality, or duress; (2) or that the consideration failed, or that payment had been made, or that there had been accord and satisfaction at the time of the indorsement, or that there was some equitable defense arising out of the transaction in which the paper was given which disabled his indorser in whole or in part to recover. And these defenses are called an equity attaching to the instrument." Daniel, Neg. Inst. (3d Ed.) § 725a. It is true he might be protected as an innocent purchaser if he took from a holder for value who purchased before maturity, without notice of any equities in favor of the obligor. But the rule is well established that when the obligor shows that the bonds were illegally issued, or are without consideration, the burden then shifts to the taker after maturity to show that the party from whom he took purchased before maturity, for value, without notice. The mere possession of the paper by the plaintiff is not enough. Smith v. Sac Co., 11 Wall. 148, 20 L. Ed. 102; Commissioners v. Clark, 94 U. S. 285, 286, 24 L. Ed. 59; Stewart v. Lansing, 104 U. S. 505, 26 L. Ed. 866.

There being a total absence of any proof that the party from whom Edwards claims to have bought, or any other prior holder, took before maturity for value paid, the plaintiff does not sustain the relation of an innocent purchaser for value, and therefore occupies no better position than the railroad company, if it were attempting to enforce the collection of these bonds. As the act of 1868 (Laws Mo. 1868, p. 92) is the source of authority under which the bonds in question were issued, it is axiomatic that no authority ever vested in the county court to issue the bonds until all of the acts precedent to the exercise thereof were substantially and definitely complied with. The first section of this act provides as follows:

"Section 1. Whenever twenty-five persons, tax payers and residents in any municipal township, for election purposes, in any county in this state, shall petition the county court of such county, setting forth their desire, as a township, to subscribe to the capital stock of any railroad company in this state, building or proposing to build a railroad into, through or near such township, and stating the amount of such subscription, and the terms and conditions on which they desire such subscription shall be made, it shall be the duty of the county court, as soon as may be thereafter, to order an election to be held in such township to determine if such subscription shall be made; which election shall be conducted and returns made in accordance with the law controlling general and special elections; and if it shall appear from the returns of such election, that not less than two-thirds of the qualified voters of such township, voting at such election, are in favor of such subscription, it shall be the duty of the county court to make such subscription in behalf of such township, according to the terms and conditions thereof, and if such conditions provide for the issue of bonds in payment of such subscription, the county court shall issue such bonds, in the name of the county, with coupons for interest attached; but the rate of interest shall not exceed ten per cent per annum; and the same shall be delivered to the railroad company."

The petition to the county court, which was the inception and basis of its action, did not recite that the petitioners were "taxpayers and residents" of Mt. Pleasant township. Its recitation is, "The undersigned, your petitioners, citizens of Mt. Pleasant township, in said county," etc. The existence of this fact is a jurisdictional fact. And the county court, for the purposes of such action, being a court of special and limited jurisdiction, the requisite fact of a petition by "twenty-five persons, taxpayers and residents of the township," should have been affirmatively found by the court and expressed upon its record before the court could acquire jurisdiction to order an election. Without this fact previously asserted and found by the court affirmatively, the whole subsequent proceedings of the county court were coram non judice. Galpin v. Page, 18 Wall. 371, 21 L. Ed. 959; Ells v. Pacific R. R., 51 Mo. 203; Thatcher v. Powell, 6 Wheat. 119, 5 L. Ed. 221; State v. Woodson, 41 Mo. 230, 231; McCoy v. Zane, 65 Mo. 11–16; Corrigan v. Morris, 43 Mo. App. 461; City of Kansas v. Ford, 99 Mo. 91–94, 12 S. W. 346; Kansas City, St. J. & C. B. R. Co. v. Campbell, 62 Mo. 588; Zeibold v. Foster, 118 Mo. 354, 24 S. W. 155; Hansberger v. Pacific R. Co., 43 Mo. 196–200; Peacock v. Bell, 1 Saund. 74b.

If it should be conceded to the plaintiff that, notwithstanding the petition (which is the initial and essential step to confer jurisdiction on the county court) might not express on its face the fact that the subscribers were taxpayers and residents of the township, it would not defeat the jurisdiction, provided the county court had, prior to the making of the order calling the election, found and affirmatively adjudged that the petitioners were taxpayers and residents, yet the order made by the county court of April 1, 1870, on the presentation of said petition, did not find and adjudge that the 111 names to the petition, or any number of them, were taxpayers and residents of Mt. Pleasant township. It simply ordered that a special election be held in Mt. Pleasant township "in accordance with the petition of 111 citizens of said township filed herein." All of which could have been true and yet not a single petitioner have been a resident taxpayer of the township. Nowhere, and at no time prior to ordering and holding the election, did the court find and declare that twenty-five taxpayers and residents of Mt. Pleasant township had petitioned the court for such election. To meet this glaring defect and fatal omission in the record, counsel for plaintiff has recourse to an entry made by the county court on its records on the first Monday of June, 1870, which simply recites the return of the clerk of the court showing that an election had been held on the 3d day of May, 1870, the date the sense of the citizens was taken on the question of the subscription to the railroad and the issue of bonds; whereupon it is ordered by the court "that the sum of ninety thousand dollars ($90,000) be and the same is hereby subscribed, etc., in the name and behalf of Mt. Pleasant township, in said county, subject to and in pursuance of all the terms, restrictions, and limitations of the petition of taxpayers and residents of said township heretofore filed, and the order of this court thereunder so made as aforesaid on said 5th day of April, 1870."

By no possibility of any known permissible intendment of law can this be held to be a judicial finding and ascertainment of the prerequisite fact, essential before an election was ordered, that the petitioners were taxpayers and residents of the township. There are several insuperable objections to accepting this as a finding by the court of the required fact. It was a statement simply by way of recitation referring to the petition that had been filed. It did not undertake to make any finding that the parties were taxpayers and residents of Mt. Pleasant township. It would be bad even as a pleading undertaking to plead an essential fact by way of recitation. The county court could not, at the June term, 1870, have undertaken to amend its record made in April, 1870, which was during the February term of the court. Under the statute, as it then existed, the·term of the county court extended from the first Monday in February to the first Monday in June, when a new term of court supervened. The record entry made at the April term had then passed out of the breast of the court, and must stand or fall just as it was then made. It would be a practice most vicious and fraught with danger to establish a rule for this case that the court, having ordered an election without having before it a petition from the taxpayers of the township reciting the jurisdictional facts, and without having ascertained and entered of record the fact that the petitioners were qualified signers of the petition,—to permit such a court, of limited jurisdiction, at a subsequent term, even to undertake to amend its record prior to the calling of the election so as to show its jurisdiction, and much more for a court to hold that in another order, having in mind something else, and by way of mere recitation,·it was sufficient to supply the omission in the order calling the election.

The reported cases teem with instances where parties have undertaken to supply omissions of courts of limited jurisdiction·to show affirmatively the jurisdictional fact of record before process issued, or some right thereunder is asserted, by way of amendment at a subsequent term. 1 Black, Judgm. § 158, lays down the fundamental proposition that "the allowance of an amendment should never be used by the court as a means· of reviewing its judgments on the merits, or correcting its own judicial mistakes, or substituting a judgment which it neither in fact rendered or intended to render. When the defect consists in the failure of the court to render the proper judgment, or arises from want of judicial action, the record cannot be corrected after the term has closed, the cause being no longer sub judice. * * * The power to amend nunc pro tunc is not revisory in its nature, and is not intended to correct judicial errors. Such amendments ought never to be the means of modifying or enlarging the judgment, or the judgment record, so that it shall express something which the court did not pronounce. However erroneous, the express judgment of the court cannot be corrected at a subsequent term." This principle is very aptly illustrated by the case of Corrigan v. Morris, 43 Mo. App. 456. There it was essential that the record should show that a justice of the peace was a justice in the city of Kansas. After motion to quash an execution on a judgment rendered by him, an amended transcript from his court

was filed, undertaking to supply the omission in the original judgment. The court said:

"An avoidance of this rule is attempted by getting an amended transcript from the justice which does show him to be a justice of the peace in the city of Kansas. This amended transcript does not show any mistake in the foregoing, but does show that the justice altered his docket after the rule served upon him, so as to make it show jurisdiction where, at the time the proceedings were had, it did not appear. We are of the opinion that this cannot be done. For jurisdiction in cases like this may be said not to depend on the fact, but on such fact appearing in the proceedings. If such fact does not appear, the proceedings are coram non judice."

Adjudications relied upon by plaintiff to support the proposition that, "if the signers of the petition had been only citizens, and not taxpayers, this would have been but an irregularity which would not have affected the validity of the bonds," will be found, upon proper analysis, to be predicated of estoppel created by the recitals in the bonds that the conditions precedent had been complied with, and the like; and this doctrine is applied with respect of bona fide purchasers before maturity.

The act of 1868 in question provides that upon presentation of the required petition the court shall "order an election to be held in such township to determine if such subscription shall be made, which election shall be conducted and. returns made in accordance with the law controlling general and special elections; and if it shall appear from the returns of such election that not less than two-thirds of the qualified voters of such township voting at such election are in favor of such subscription, it shall be the duty of the county court to make such subscription in behalf of such township, according to the terms and conditions thereof," etc. As this election was held in 1870, it was subject to the provisions of chapter 2, "Elections," St. 1865, there being then no special statute for special elections except such as might be ordered to be held at other times than general election days. Under the statute, elections were conducted by judges and clerks. At the close of the polls, the poll books should be signed by the judges and attested by the clerks. The judges, at the close of the election, were to transmit one of the poll books by one of their clerks to the clerk of the county court within two days thereafter, the other poll book to be retained in the possession of the judges of election. By section 25—

"The clerk of each county court shall, within eight days after the close of each election, take to his assistance two justices of the peace of his county, or two justices of the county court, and examine and cast up the vote given to each candidate, and give to those having the highest number of votes a certificate of election."

Sec. 26. "The clerks, in comparing the returns from the several townships, shall do it publicly in the court house of their counties, first giving notice of the same, by public proclamation at the court house door."   ·

Sec. 28. "The clerk of the county to which such returns shall be made, after examining the same, shall certify the result to the secretary of state, and give to the person having the highest number of votes a certificate of his election, under the seal of his office."

The only evidence, therefore, which the county court could have of the result of the election was the certificate of the county clerk.

The only evidence of this certificate offered by the plaintiff was the county court record of first Monday in June, 1870, which recites:

"Now at this day is filed in open court the certificate of the clerk of this court, showing that on the 3d day of May, 1870, an election of the qualified voters of Bates county, state of Missouri, was held to obtain the assent of said voters to subscribe the sum of ninety thousand dollars ($90,000) to the capital stock of the Lexington, Chillicothe & Gulf Railroad Company, in pursuance of an order of this court," etc.

To this evidence the defendant objected, as it showed on its face that it was an election of the qualified voters of Bates county, and not by the qualified voters alone of the township. As the plaintiff neither offered to produce nor show aliunde that the certificate of the clerk was different, it must be assumed, as against the plaintiff relying on this part of the record, that the certificate of the clerk only recited what this order states,—"an election of the qualified voters of Bates county." As this was the evidence before the court, from which alone it was authorized to find that the proposition voted on had been lawfully carried, it is concluded therefrom that "the court being satisfied that two-thirds of the qualified voters of said township who voted at said election did vote in favor of said subscription and have given their assent thereto" was wholly unauthorized. The result, as certified by the clerk, is the only basis for the action of the county court. The certificate of the clerk was a jurisdictional fact, to be affirmatively found, to authorize the court to make its order. State v. Harrison, 38 Mo. 541; State v. Steers, 44 Mo. 224; State v. Mackin, 41 Mo. App. 100; State v. Prather, 41 Mo. App. 451, 452; In re Rothwell, 44 Mo. App. 215; Comfort v. Ballingal, 134 Mo. 281–294, 35 S. W. 609.

The act in question also provided that if the conditions of the subscription provide for the issue of bonds in payment of such subscription, the county court shall issue such bonds in the name of the county, and the same shall be delivered to the railroad company. This act, which was the source of power to the county court, is to be presumed to have expressed the legislative will and policy, which was, that if the township, instead of undertaking to pay, by direct taxation, its subscription, should elect to issue bonds therefor, the bonds should be delivered directly to the railroad company in payment of its subscription. The statute did not contemplate or provide for the appointment of a commissioner and the delivery of the bonds to him to be hawked about and sold, and the proceeds, after the discount and expenses of the commission, be turned over to the railroad company. It was an enabling statute, conferring authority on the county court to issue bonds in payment of the subscription, to be delivered directly to the railroad company, and it was, therefore, without the power to issue and dispose of such bonds in any other manner or for any other purpose. No consent of any given number of voters of the township could confer on the county court the power to issue and dispose of the bonds, which were to create a burden upon the property, real and personal, of every property owner of the township, except as prescribed by the statute. The order of the county court not only provided for a commissioner to make the subscription to the

railroad, but expressly authorized him "to sell and dispose of said bonds to the best of his ability," with no other limitation on him. So that if the best he could do on the market was to obtain 50 cents on the dollar, at par value, he could do so. The evidence shows that 43 of the bonds issued were sold by James A. Boreing, claiming to be commissioner of the county, to Gaylord & Co., of which firm the plaintiff was then a member, and the transaction was conducted by him. The bonds were bought at a discount of 25 cents on the dollar, and a commission was allowed to this commissioner of $1,350 out of the proceeds, thus lessening the ability of the obligation of the railroad company to build the road. The county court was but the special agent of the township, with powers clearly defined and limited by statute, which was its power of attorney. The county court having no official connection with a township, and being its special agent, created by statute, the township could not be bound unless the court's action was within the power delegated to it by the enabling act. Wilson v. Salamanca Tp., 99 U. S. 504, 25 L. Ed. 330; Scotland Co. v. Thomas, 94 U. S. 691, 24 L. Ed. 219; Lawson v. Schnellen, 33 Wis. 293. Every buyer of the bonds from the so-called county commissioner took them with notice of lack of authority under the statute to sell and deliver. Morrill v. Cone, 22 How. 81, 16 L. Ed. 253; Pettis County v. Gibson, 73 Mo. 502. It is true the evidence shows that 47 of the bonds were later turned over to the railroad company by this commissioner; and therefore the contention is made that it devolves upon the defendant to show that the bonds in suit were part of the 43 sold to Gaylord & Co. It is a well-established rule of law that the validity of a statute, as of a contract, is to be determined by what it authorizes on its face to be done, rather than by what was done under it. As the order of the county court, in direct contravention of the enabling statute, directed the delivery of the bonds to the commissioner, a third party, with authority "to sell and dispose of to the best of his ability," when it is shown that 43 of the bonds were so sold, and that the plaintiff was a purchaser of said 43 bonds, the burden should be cast upon him rather than the township to trace the bonds which he claims afterwards to have bought. The county court was the agent of the township under a statutory power of attorney limiting its agency. And as the purchaser of the bonds was referred by their face to the power of attorney and the order made by the county court for their issue, and knew that the bonds were being hawked and sold by a commissioner, he was put upon his guard, and in good conscience should be held to show that the bonds he seeks to recover on were properly disposed of. The danger of permitting the county, acting for the taxpayers of the township, to depart in this respect from the express direction of the statute, is fitly illustrated by this conjuncture of affairs. Had the county ordered, as the statute directs, the bonds delivered to the railroad company, there would be no difficulty in tracing the taker; but the county, through a subagent, not authorized by statute, having sold 43 of the bonds at a discount of 25 per cent., and paying the subagent $1,350 commission, rendered it impracticable, if not impossible, for the

township to protect itself against this wrong, unless the burden should be cast on the purchaser of the bonds situated like this plaintiff.

I am unable to assent to the proposition, asserted in the very able brief of counsel for plaintiff, that the failure of the railroad company to locate and build its road through Mt. Pleasant township to the town of Butler, and to locate and continue a depot within a third of a mile of the courthouse, constitutes no failure of consideration, and consequently is no defense to the bonds in the hands of this plaintiff with notice. The distinction between mere motive for an act and consideration therefor is recognized and applied by the courts in a proper case. The anticipated benefits to come to a community from the building of a railroad may be among the inducements to the taxpayers to subscribe to its stock; but, as applied to the facts of this case, it cannot be maintained that, because a municipality should become a stockholder by making a subscription, it becomes bound to pay the same, notwithstanding the contract expressly provides that the railroad is to build and complete the road as specified, except in favor of an innocent purchaser for value before maturity, where the recitals in the bonds show performance of conditions. It was not sufficient authority, under the statute in question, for the county court to make the subscription for the township that it should receive a petition thereto signed by 25 taxpayers, etc., but the statute requires that this petition shall state "the terms and conditions on which they desire such subscription shall be made." The county court can neither add to nor subtract from the terms and conditions.

While it is to be conceded that the petition of citizens to the county court, in prescribing the conditions of the subscription, is not as explicit as it should have been, yet, taken in its entirety, and reading all of its provisions together, with a view of ascertaining what was the true intent and purport of the consideration for the subscription, it is quite clear that it was intended that the railroad company, in case the bonds were elected to be issued by the township, should put under contract all the road south of the city of Lexington to the south line of Mt. Pleasant township; and that then the county should "make, or cause to be made, her bonds for the amount herein provided, and deliver the same into the hands of said commissioner"; and that, as the work progressed, in the work of construction 90 per cent. of the proceeds of the bonds might be turned over to the railroad company, upon evidence furnished by the engineer. This was immediately coupled with "the condition, made on the part of the railroad company, that if said railroad company shall locate said railroad into and through Mt. Pleasant township to the town of Butler in Bates county, and commence and complete a road on the line of said location to the town of Butler within two years after the delivery of said bonds (that is, after the delivery to the commissioner), and locate and continue a depot within one-third of a mile of the courthouse in Butler, and commence the building of that portion of the road lying within Mt. Pleasant township at the point where the depot is to be located, and build and complete said roadbed from that point to the north line of said township, then, and as said work is in state of progression, said bonds or their equivalent shall be delivered

to said company as herein provided." From which it is clear that neither the petitioners nor the electors contemplated that the bonds, or their proceeds, should be turned over by the commissioner to the railroad company until after its road was located and the work was being done to completion in "building a road on the line of said location to the town of Butler," and that this work was to be done inside of two years, establishing a depot within a third of a mile of the county seat, and building and completing the road from that point to the north line of the township, "then, and as said work is in state of progression, said bonds or their equivalent shall be delivered to said company."

The company was not, therefore, entitled to have the bonds turned over to it simply by locating a line of railroad, by grading it in detachments, but not completing it as a railroad, without even beginning the erection of any depot near the town of Butler, the county seat of the county, the principal town in Mt. Pleasant township, or extending its line to the north line of the township. In short, it is perfectly apparent, from the conditions imposed by the petitioners, that it was the purpose to have the railroad into and through this township, with a depot established for their accommodation, and that this work was to be done within two years; and this was made the condition of the subscription and delivery of the bonds. As said in German Sav. Bank v. Franklin Co., 128 U. S. 526, 9 Sup. Ct. 159, 32 L. Ed. 519:

"Under such circumstances, any condition imposed by the vote as a condition precedent to the issuing of the bonds in payment of the subscription was a part of the vote, and a part of the authority for the subscription. So, also, any condition prescribed by the vote as a condition precedent upon which the bonds should be issued must have been complied with, in order to make the bonds valid and binding."

See also Citizens' Savings & Loan Ass'n v. Perry Co., 156 U. S. 700, 701, 15 Sup. Ct. 547, 39 L. Ed. 585.

True it is, these rulings were on the laws of Illinois, inhibiting the issuing and delivery of bonds unless the conditions of the subscription were complied with, which were precedent acts; the only difference in fact in the case at bar being that the bonds were to be issued and delivered to the commissioner, to be by him held, to be delivered to the railroad company on condition that the road should, within two years, commence and complete a road on the line of the location to the town of Butler after the delivery of the bonds to the commissioner, and should also locate and continue a depot at a given point, and would commence and complete the building of that portion of the road in the township from the depot to the north line of the township, and be entitled to the delivery of the bonds as the work was in state of progression. There is nothing in the recitals of the bonds in question which precluded the county, on behalf of the township, from showing that the conditions were not complied with. The bonds only recite that they are issued by the county court of Bates county "by virtue of an act of the general assembly of the state of Missouri, approved March 23d, 1868, etc., and authorized by a vote of the people taken May 3d, 1870, as required by law." There

is no recitation that the conditions had been complied with by the railroad company, upon which the bonds were issued. As said in Citizens' Savings & Loan Ass'n v. Perry Co., supra, at page 704:

"As the recitals in the bonds issued * * * neither expressly nor by necessary implication imported a compliance with the condition precedent imposed by popular vote in reference to the location of the company's shops at Duquoin, it was open to the county to show that that condition was not performed when the bonds were issued by order of the county court, and had never been performed."

Especially must this obtain as against a party purchasing after maturity, and with notice (as the evidence shows in this case) of the fact that the county was resisting payment of the bonds.

The further question is raised by defendant against the validity of these bonds, based upon the fact that the subscription, if voted for by the citizens of Mt. Pleasant township, was to the Lexington, Chillicothe & Gulf Railroad Company, which the plaintiff claims was afterwards consolidated with the Pleasant Hill Division of the Lexington, Chillicothe & Gulf Railroad Company, under the name of the Lexington, Lake & Gulf Railroad Company, and as, on a well-established rule of law, the Lexington, Chillicothe & Gulf Railroad Company thereby ceased to exist by being merged into the consolidated company, the consolidated company never became entitled to the bonds in question. This question was directly passed upon by the supreme court in the case of Harshman v. Bates Co., 92 U. S. 569, concerning the bonds in question, in which it was held that, as it did not appear from the record before it that the subscription had been made to the Lexington, Chillicothe & Gulf Railroad Company prior to the consolidation, it did not pass, by devolution, to the consolidated company under the statute authorizing such consolidation. The court held that, as long as the authority to the county to make the subscription remained unexecuted, "the occurrence of any event which creates a revocation in law will extinguish the power. The extinction of the company in whose favor the subscription was authorized worked such a revocation. The law authorizing the consolidation of the railroad companies does not change the law of attorney and constituent." This ruling was reaffirmed in Bates Co. v. Winters, 97 U. S. 83–89, 24 L. Ed. 933, in which it was further decided by the court that the order of the county court in this case making the subscription "was not intended to be final and self-executing. While it recited that the sum named should be, and was thereby, subscribed, it 'authorized and directed' the agent 'to make said subscription on the stock books of the said company' upon the conditions specified, and to report to the court herein." It appears from the report of the last named case, on page 90, that it was made to appear, by the agreed statement of facts upon which that case was tried, that the agent of the county to make the subscription returned to the court in January, 1871, that he had made no subscription of this stock to the company prior to the act of consolidation. Thereupon the case was reversed, and sent back for further proceedings in conformity therewith. On retrial of the case, another finding of facts was brought about by agreement of counsel, in some way unknown

to this court, by which it was made to appear that the county court of Bates county had appointed A. L. Betz agent of the county to make this subscription on behalf of Mt. Pleasant township in the order of June 1, 1870, when the order of subscription was made; and that he presented this order to the board of directors of the railroad company, and that the same was accepted on the 17th day of June, 1870; and upon this showing the plaintiff in that case prevailed in the litigation.

On the trial of the case at bar, it is developed by the original record book of the county court, introduced in evidence here, that no such order was ever made by the county court of Bates county appointing said Betz agent for such purpose. It appears on page 93 of the minute or record book of the railroad company, in what purports to be a certified copy of the records of the Bates county court, spread upon the records of the railroad company, that A. L. Betz had been appointed agent of the county at the time of making the order of subscription aforesaid. But that the insertion of A. L. Betz's name in said purported copy was a clear fabrication there can be no question. This entry on the record book of the railroad company is clearly incompetent evidence against the defendant. It is not the original record evidence of the county court, nor is it a certified copy therefrom; it only purports to be copied onto the book from a certified copy. As such it is a self-serving statement, made up by the railroad company, which, on every rule of law and common justice, is inadmissible against a third party. Board of Com'rs v. Keene Five Cents Sav. Bank, 108 Fed. 507, 47 C. C. A. 464; Coffin v. Board (C. C.) 114 Fed. 518. The only reference made in the records of the Bates county court to A. L. Betz first appears in the proceedings of the court on the 19th day of December, 1870, which merely recites that "now at this day comes A. L. Betz, commissioner heretofore appointed by this court, to subscribe stock to the Lexington, Chillicothe & Gulf Railroad Company, and as such presents his report, which is approved." What this report was, or what it contained, is not shown by the record, nor was any such report offered in evidence by the plaintiff. Neither does it appear from this entry that the stock he was to subscribe was on account of Mt. Pleasant township. A mere order of a county court, if it had been made, designating A. L. Betz agent "to subscribe stock to the Lexington, Chillicothe & Gulf Railroad Company," would not be sufficient to show that he was authorized to subscribe this particular stock, especially so in view of the fact that the record shows that Grand River township had also voted a subscription. Neither does this mere recitation show when he was appointed. This entry was of date December 19, 1870, more than two months after the act of consolidation; and it does not appear, therefore, that he was appointed such agent prior to the act of consolidation, which the plaintiff claims occurred October 4, 1870. And as proof most persuasive that the county court of Bates county had not theretofore appointed any agent to make a subscription of this stock, and that it understood that no such subscription had been made, on the 18th day of December, 1870, it appointed James M. Boreing as commissioner for the

sale of the bonds in question, and required him to give bond in the sum of $180,000 for the faithful performance of his office,—just double the amount of the $90,000 of bonds to be issued. On the 18th day of January, 1871, his bond was approved by order of court; and thereupon an order was made by the court for the issue of the bonds, payable to the consolidated company, the Lexington, Lake & Gulf Railroad Company. And, after reciting the consolidation of the roads, the court, on said January 18, 1871, made this further order:

"That said bonds be delivered to James M. Boreing, commissioner, and the proceeds thereof by him paid over to the said Lexington, Lake & Gulf Railroad Company, or their agent, according to the terms and conditions of said subscription herein referred to, and said bonds numbering from one to ninety, inclusive. Said James M. Boreing is hereby authorized to subscribe said stock to said railroad company."

On page 144 of the so-called minute or record book of the railroad company, after the articles of consolidation had been recorded therein, is entered the subscription, over the signature of said James M. Boreing, commissioner, of the $90,000 of stock to the Lexington, Lake & Gulf Railroad Company, in pursuance to said order of the county court of January 18, 1871. This is followed by two other subscriptions made on said book from other townships, and these are the last entries of any character whatever made in this book. The balance of the book from page 148 to page 284 is an entire blank. Had the subscription been made by an agent appointed by the county court prior to the consolidation, there would have been no occasion for this appointment of Boreing as such agent on January 18, 1871, to make such subscription to the consolidated road, as the subscription already made to the Lexington, Chillicothe & Gulf Railroad Company would have passed, by devolution and operation of law, and the articles of consolidation, to the consolidated company. The county court did not issue any bonds until after this order of January 18, 1871, as until the subscription made by its agent, Boreing, it did not recognize any obligation to issue the bonds. The first lot of bonds, 43 in number, were sold by Boreing, as such agent, to Samuel A. Gaylord & Co., June 14, 1871, as shown by copy of the account between said Boreing and said Gaylord & Co. filed with the clerk of the county court. And on the first Monday of May, 1871, as shown by the records of the county court, said Boreing made his report showing that he had turned over the remaining 47 bonds to the railroad company and received credit therefor.

It further appears from said minute or record book of the railroad company, on page 84, that at a meeting of the board of directors of the railroad company, held at Lexington, Mo., on the 17th day of June, 1870, "A. L. Betz, together with such persons as he may designate or associate with him, be authorized to obtain subscriptions from counties, towns, or townships along the line of said railroad to the capital stock thereof, and to discharge said duty, by authority of said company, until further ordered by the board, but without expense to the said company." And on the same day said Betz appeared before said board, and presented the purported certified copies of the proceedings of the county court of Bates county, in which his name

is inserted as the duly appointed agent of the county court for making this subscription. Either he, or some one unauthorized by the county court, which can speak alone by its record, fabricated this interpolation of his name as agent of the county. There is palpable reason why the record of the Bates county court should show affirmatively the selection and appointment by the county court of the agent or commissioner to make the subscription on behalf of the township on the books of the railroad company. Both by the terms of the petition of citizens of the township to the county court asking for an election, etc., and the order for election and the order of subscription, it was provided that the agent, who was to be appointed by the county court, should be a citizen of Bates county. This was deemed important by the citizens of the township, especially as it was provided that this agent was to dispose of the bonds "to the best of his ability," and to see to the making of the subscription on the books of the railroad company. The county court had, therefore, no power to appoint any other person than a citizen of the county. So, whether or not this fact of citizenship should have been expressed on the record of the court, it must be conceded that the fact must have been found by the court in making the appointment, as much so as if the terms of the petition had required that John Smith of Mt. Pleasant township should be appointed as such agent. There is nothing in the records of the county court to show that A. L. Betz, who is claimed by the plaintiff to have acted as such agent, was a citizen of Bates county; and no competent evidence aliunde was offered by the plaintiff showing such essential fact.

In view of the fatal objections already discussed to the validity of these bonds, it is not deemed necessary to discuss and determine the question raised by defendant, that the evidence fails to show that any notice was given of the stockholders' meeting to consider the proposed consolidation of the two roads; nor the effect of the certiorari proceedings instituted during the pendency of this suit; nor the question raised by counsel that the two roads as projected were parallel roads, and therefore not capable of being consolidated under the act of the state legislature of 1870 then in force; nor the question raised by counsel that the consolidated road materially varied from the projected line of the railroad to which the subscription is claimed to have been voted.

Another important question arises on the record and the evidence in this case, which the court should discuss. As this suit was instituted October 5, 1891, if the bonds did not then belong to the plaintiff, but in fact to a citizen of Missouri, the action is a fraud upon the jurisdiction of this court; and the moment, in the progress of the case, this fact appears, the plaintiff should go out of court. There are many facts and circumstances characterizing this transaction which impel the belief in the mind of the court that the plaintiff Edwards was and is a "dummy" used to give jurisdiction to the federal court, and that the real owners of the bonds at the time the suit was instituted were Weil & Co.

The firm of Gaylord & Co. of St. Louis, of which the plaintiff was a member, became the purchasers of 43 of these bonds on June 17,

1871. Whether the bonds in suit belong to this lot the evidence does not disclose. Afterwards, about the year 1885, this firm became bankrupt. After that the plaintiff, up to the time of his alleged purchase of the bonds in suit, does not appear to have been engaged in any remunerative business so as to have recovered any part of his lost fortune. Mr. Donaldson, in his first deposition, taken May 10, 1898, in this case on behalf of the plaintiff, and who is certainly a favorite witness of the plaintiff, with an accommodating memory, testified that in the year 1890, in August or September, he remembered that the plaintiff, who claimed to have obtained the bonds from a man by the name of Champion, as administrator of some estate in St. Louis, asked the witness to get the bonds compromised for him, and that he wrote to the clerk, and went down once to the Bates county court,—he thinks in the latter part of October, 1890. He did not remember the numbers of the bonds, but that the coupons of 1873 and subsequent years were attached; that he held the bonds for a short time, until after the court had passed upon the subject, and would not agree to submit the proposition to a vote; that he offered to compromise at 65 cents; and that he saw a check given for the bonds. In his last deposition he testified that at the time of the alleged purchase of the bonds the plaintiff "had his office at that time in Weil's office," the firm of Weil & Co. being then engaged in the bond brokerage and banking business in St. Louis.

The plaintiff testified that he paid for the bonds by giving "a check or order" on Weil & Co. So the purchase money for the bonds was furnished by Weil & Co. No such check or order is produced by Weil & Co. or the plaintiff. No note was taken by Weil & Co. from Edwards for this money. No book account is shown by Weil & Co. showing any account between the parties. Edwards went to New York, and this suit was brought by Mr. Skinker, an attorney who had long been counsel for Weil & Co., on the 5th day of October, 1891.

As the two bonds, exclusive of interest, did not exceed $2,000, and it was then an open question whether the coupons attached to the bonds sued on representing the interest could be reckoned in "the amount in controversy" to give this court jurisdiction, a second count was made to the petition, counting on several funding bonds issued by Bates county on behalf of Mt. Pleasant township, notwithstanding the interest thereon had been provided for by the county and was subject to demand by the holder of these funding bonds. It is now developed by the deposition of A. J. Weil that he was then the owner of the funding bonds, and he testifies herein: "I loaned these bonds to Mr. Skinker." Why he did this he does not even deign to explain. But, as Mr. Skinker used them to eke out the supposed necessities of the Edwards suit, the inference is justified that Mr. Skinker so advised him; and, as he disclosed no other consideration for this loan, the further inference is warranted that he must have been deeply interested in having the Edwards suit maintained in this jurisdiction.

The history of the suits on these bonds in this court is shown in the opinion of this court in Edwards v. Bates Co., 55 Fed. 436. Suit was first brought on these bonds by Thomas K. Skinker, as attorney,

in the name of one Norman De V. Howard, to which a demurrer was sustained as the suit did not exceed $2,000, exclusive of interest and costs. Without dismissing that suit, and while it was pending, the same attorney brought suit on the same bonds in favor of this plaintiff, and in addition thereto on seven funding bonds of the county for $100 each, dated October 1, 1885, and not maturing on their face until 1905. The county, by condition attached to the funding bonds, reserved the right to redeem the same at any time after five years from their date, with a provision that, if not presented within 30 days after notice by the county of its election to redeem, the bonds should cease to bear interest, and should be payable on presentation to the county treasurer. Notice having been given to redeem, Weil did not present the bonds for payment within 30 days, and it was held that it was apparent that the suit was brought on the funding bonds (solely for the purpose of increasing the amount in suit beyond $2,000), about which there was no real controversy, and therefore the court had no jurisdiction; the coupons attached to the two bonds in question being in the nature of interest. On writ of error to the supreme court it was held that, in determining the jurisdictional amount in an action in the circuit court of the United States to recover on municipal bonds, the matured coupons thereto are to be treated as separable, independent promises, and not as interest due upon the bond, and therefore the court had jurisdiction, exclusive of the funding bonds declared on in the second count. It was after this that the plaintiff dismissed the count as to said funding bonds. The incorporation of the second count, based on the bonds loaned by Weil to help out, as was then supposed, the jurisdiction of the court, showed a deliberate purpose to perpetrate a fraud on the jurisdiction of this court.

The fact being developed on this trial that J. C. Weil or J. C. Weil & Co. are back of this suit, paying all the expenses of its prosecution, the position is assumed by the plaintiff that J. C. Weil became the owner of the bonds since the institution of this suit. To this end the deposition of Edwards was taken, in which he testifies that in payment of the bonds "I gave a check or order on A. J. Weil, the banker, for the amount of the purchase. * * * When I got back to New York, I paid Weil in money for these bonds. I do not know how I paid him. I think I owed it to him for some time. There were a number of other transactions involving money at the same time. I never gave him a note. When settling up with Weil, I did not take up my checks and orders; I simply looked over the accounts." If this was the truth, Edwards, having liquidated the debt to Weil & Co. for the purchase money advanced for the bonds, remained their unqualified owner. How, then, did A. J. Weil subsequently become the owner, as plaintiff's counsel now admits he is? His deposition contradicts Edwards. In answer to the eleventh interrogatory: "State when and how the plaintiff paid him, or the firm of J. Weil & Company, the amount of the purchase price of the two bonds," he said: "When the Mount Pleasant township bonds were paid for by A. J. Weil & Company, of St. Louis, for Mr. Edwards, they were charged on the books of that firm to Mr. Ed-

wards' individual account, and the account was transferred from A. J. Weil & Company of St. Louis to A. J. Weil & Company of New York, and A. J. Weil & Company of New York charged the same to Mr. Edwards' individual account, and was paid for by him; and when the firm of A. J. Weil & Company of New York was dissolved, in settlement of the account of Edwards this claim was part payment of this account, and A. J. Weil & Company of New York became the owners of whatever proceeds would be realized by Mr. Edwards in this suit; and it was further understood that this suit was to be prosecuted in his name." And in answer to the twelfth interrogatory he said: "I do not remember how the payment was made, but know it was made."

A more involved, lack-candor statement by an intelligent business man is rarely presented to a court. If A. J. Weil & Co. of New York "charged the same to the individual account of Edwards, and was paid for by Edwards," why did not Edwards still remain the owner? And how, then, did Weil & Co. become the owner? The witness proceeded by way of explanation to say, in effect, that afterwards, when the firm of A. J. Weil & Co. was dissolved, in the settlement of the account of Edwards this claim was a part of this account. What was there to settle of Edwards' account if he had already paid it to the firm, as Edwards testified he had done? The fund had already gone into the copartnership assets, and there was no allotment, on dissolution, of Edwards' claim to one of the partners, and the transfer by Edwards of the bonds to one of the partners in liquidation of his alleged debt; but the bald further statement of the witness is that "A. J. Weil & Company of New York," the firm itself, became the owners. If, looking at his whole deposition, it is to be said that the witness meant to say that he took the bonds in settlement of the account against Edwards, there is not only a palpable contradiction of Edwards' statement that he paid Weil in money or otherwise, but it leaves the case in perfect consistency with the mere letter of the statement that Edwards bought the bonds and paid the vendor therefor, but with Weil & Co.'s money; and after his name served the purpose of a suit in the United States court the bonds remained those of Weil & Co., with not a dollar paid therefor by Edwards or by Weil & Co. to him, except as a "dummy" in the original transaction. There is not a mark of a pen between these parties to evidence any indebtedness of Edwards to Weil & Co. No note was ever taken; and when the account books, which should show the transaction, are called for, they are not presented. Edwards was a mere impecunious desk holder in Weil & Co.'s office when the bonds were bought on speculation, when, as the testimony shows, he knew they were being repudiated by the county. They were not put up even as collateral security with Weil & Co.

Outside of Edwards' statement that he paid the costs in this case, without producing a receipt, check, or letter from the clerk or the attorney, it is admitted that Weil has paid all of the costs of the litigation after 1892. What costs, then, did Edwards pay? What costs were due from him? If he paid to the clerk or attorney,

where is his receipt or letter evidencing it? If this is an honest, open transaction, why did Mr. Weil, in taking his deposition, refuse to show his letter book giving the correspondence touching this litigation? As the defendant, in order to get at the facts in this case as best it might, was compelled to have recourse largely to the evidence in the keeping of Edwards, A. J. Weil, and their attorney, it took the deposition of Mr. Skinker, attorney for the plaintiff, and asked him to produce the correspondence between him and Weil. This he declined to do, claiming that they were privileged communications between client and attorney, but that he would produce the letters at the trial of this case; thus placing the defendant at the disadvantage of not knowing what the evidence would be, nor how to meet it, until on the final trial of the case. At the trial of the case, plaintiff's counsel still insisted that the communications were privileged, and, without waiving the objection, agreed to submit the correspondence to defendant's counsel, with the understanding that such of it as was deemed material might be submitted to the court to pass upon the question of its competency under the plaintiff's objection. As the court sustains this objection of the plaintiff, these letters are not the subject of comment, further than to say that the letters presented to counsel from Weil & Co. and A. J. Weil (the signatures being used interchangeably) to Mr. Skinker run from February, 1893, showing that there must have been previous correspondence between them; but the letters produced from Mr. Skinker to Weil do not begin until 1896, with no explanation of this circumstance. As said by Chief Justice Waite in Stewart v. Lansing, 104 U. S. 510, 26 L. Ed. 866: "The testimony is noticeable rather for what is omitted than for what was introduced. It would seem to have been easy to prove the exact facts as to the parting with the bonds." The court of appeals of this circuit, in Central Coal & Coke Co. v. Hartman, 111 Fed. 96–102, 49 C. C. A. 244, animadverted upon the unsupported, naked statement of a witness about a transaction, without producing books, letters, checks, or other data to support it, and for that reason such testimony ought not to be the foundation of a judgment in a case where the parties had books, letters, etc. This just rule ought to apply with especial force to a transaction like this, where it appears that checks passed and entries were made in account books of a firm, and not a letter or check or book is produced in corroboration, on the remarkable excuse that the books may have been sold or burned.

From the inception of this litigation the plaintiff and his attorney have been advised that the integrity of plaintiff's ownership has been challenged. And yet up to the time of the filing of the replication herein the plaintiff claimed to be the owner of the bonds, and never disclosed the interest now admitted to be in Weil; and in his deposition, taken in 1900, he unqualifiedly testified to having paid expenses and costs incident to the prosecution of the suit, and said that these payments had been made by drafts drawn on him by Donaldson in St. Louis, in amounts from $60 to $70, aggregating several hundred dollars. But Donaldson, in his testimony, afterwards taken by the defendant, testified that he never had drawn a draft on him for any

amount whatever in connection with this litigation; that he had no connection with it whatever, except the writing of the letter shown him, in his deposition, to Mr. Weil. And as further evidence of evasion and lack of candor, Mr. Weil, in his deposition, taken by the defendant, when asked as to whether or not he had paid the costs and expenses incident to this litigation, cunningly avoided disclosing the whole truth, in that he failed to answer the interrogatory (the deposition being taken on interrogatories) as to the times when these payments had been made. The question was: "Interrogatory 27. Please state what amounts, if any, you ever paid, or caused to be paid, to any and all persons as costs or expenses incident to the prosecution of this suit; to whom such payments were made and when they were made? Answer. When requested by Mr. Skinker I have paid costs in this suit."

In view of the fact that the supreme court of this state, in Webb v. Lafayette Co., 67 Mo. 353, at the April term, 1878, prior to plaintiff's alleged purchase, decided that the said act of 1868, under which these bonds were issued, was unconstitutional and void, rendering it necessary that the party seeking to recover on such bonds should not be a citizen of the state of Missouri, it is the duty of this court to see that its jurisdiction is not invoked collusively to evade the decision of the supreme court of the state construing a legislative act of the state, to which that court has ever since adhered.

On all the facts and circumstances of this case, I cannot escape the conviction that Edwards' ownership of these bonds was only apparent, and not actual.